**In re ENERGY COOPERATIVE, INC., a Delaware corporation, Debtor.**

**ENERGY COOPERATIVE, INC., Plaintiff,**

**v.**

**CITIES SERVICE COMPANY, et al., Defendants.**

**Nos. 81 B 5811, 85 C 3538.**
**Adv. No. 82 A 3699.**

United States District Court, N.D. Illinois, E.D.

Dec. 13, 1989.

Don Johnson, Hollis & Johnson, Chicago, Ill., for Cities Service.

Marc O'Beem, Miller Shakman Hamilton & Kurtzon, Chicago, Ill., for trustee.

## MEMORANDUM OPINION

KOCORAS, District Judge:

The Trustee of Energy Cooperative, Inc. (ECI) alleges that ECI made preferential transfers to the defendants during the 90 day period prior to May 15, 1981, the day the ECI bankruptcy petition was filed. The preferential transfer cases were consolidated for trial on the sole issue of whether ECI was insolvent within the meaning of 11 U.S.C. § 101(31)(A) for this 90 day period. The trial was held from September 25, 1989 through October 5, 1989. This opinion contains the Court's findings of fact and conclusions of law.

### I. *Historical Background*

ECI was formed in 1976 by eight regional farm cooperatives at which time it purchased a refinery in East Chicago, Indiana from the Atlantic Richfield Co. (ARCO). ARCO acquired the refinery through a merger in 1969 with Sinclair Oil Company, which built the refinery in 1917.

ECI purchased the refinery at a cost of $70.3 million and purchased other assets for $6.3 million. ECI paid for the refinery and other assets, in part, by executing and delivering a promissory note to ARCO in the amount of $64.7 million payable over 10 years.

ECI was organized to engage in the business of purchasing crude oil, exchanging it, refining it and selling the refined products. The essential purpose for the creation of ECI and its purchase of the refinery was to assure a supply of refined petroleum products for the eight regional farm cooperatives who owned it (Member–Owners). From 1976 to 1980, ECI made $116 million in capital expenditures for improving the refinery and an additional $21 million for repair of fire damage which occurred in 1977.

The ECI refinery had a rated capacity of 126,000 barrels a day (B/D) and a stream capacity of 140,000 B/D. The refinery's processing units included a large crude unit of 100,000 B/D, a small crude unit with 40,000 B/D capacity, a fluid catalytic crocker of 48,000 B/D capacity, an alkylation unit of 6,000 B/D capacity, a reformer of 20,000 B/D capacity and a distillate disulfurizer of 20,000 B/D capacity.

ECI experienced financial difficulty from the beginning and had suffered substantial losses in 3 of the 4 years prior to 1981. In 1980, for example, ECI incurred a net operating loss of approximately $43 million.

ECI's dismal operating experience continued in 1981 and the monthly financial statements for the periods preceding bankruptcy show the following net operating losses:

| Period (1981) | Loss |
|---|---|
| January | 1,505,000 |
| February | 3,634,000 |
| March | 10,237,000 |
| April | 23,493,000 |
| May 1–14 | 15,250,000 |

In sum, ECI sustained operating losses from January 1, 1981 until May 14, 1981 (ECI filed its Chapter 11 bankruptcy petition on 5/15/81) of approximately $54 million.

The ECI balance sheet at January 31, 1981 is the balance sheet which is available closest in time to the beginning of the 90 day preference period. The 1/31/89 balance sheet reflects total assets of approximately $511 million, total liabilities of approximately $437 million, and total stockholders equity of approximately $74 million. Plaintiff's Exhibit 74C.

Because ECI suffered losses throughout the preference period, if ECI was insolvent at January 31, 1981 it was insolvent throughout the preference period and, therefore, insolvent on each day the claimed preferential transfers were made by ECI. As reflected in the January 31, 1981 balance sheet, ECI had a net worth of approximately $74 million. A significant component of that net worth, however, is the refinery asset listed on the books at a cost of approximately $209 million, less depreciation of approximately $48 million, or a net book value of approximately $161 million. Because of the significance of the value of the refinery for bankruptcy purposes, a good part of the trial was devoted to evidence relating to that subject.

## II. Value of the Refinery

The refinery, although offered for sale both prior to and after the bankruptcy filing, was never sold. Indeed, the present Trustee requested permission to abandon the refinery in 1984 because it was in a hazardous condition and that it was a burdensome asset. The motion to abandon was never granted and this Court determined that the appropriate course of action was to dismantle the refinery assets and clean up the refinery site. That project has now been completed and the demise of the refinery is final.

The Trustee contends that the refinery had no commercial value during the entirety of the 90 day preference period, with the consequence that the assets of ECI were overstated by $161 million at January 31, 1981. Reduction of the balance sheet to correctly reflect the true value of the refinery would render ECI hopelessly and irretrievably insolvent for the entire 90 day period, argues the Trustee, rendering moot the adjustments proposed by the defendants enhancing the value of other assets or reducing its liabilities. The defendants claim that the market value of the refinery was in the $80 to $125 million range, and that the going concern value of the refinery was even higher than the fair market value.

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property at a fair valuation ..." 11 U.S.C. § 101(31)(A). In applying the balance sheet test, "assets must be valued at what they are reasonably worth (at the time of the allegedly preferential transfers) and not at what they turned out to be worth at some time after the bankruptcy intervened." *Cissell v. First National Bank of Cincinnati*, 476 F.Supp. 474, 482 (S.D.Ohio 1979). Fair value has been interpreted to mean the amount which can be realized from the assets within a reasonable period of time. *In re Utility Stationery Stores*, 12 B.R. 170 (Bankr.N.D.Ill.1981).

If the test was what the assets were worth at some time after bankruptcy intervened, it would, of course, be an easy case. The only choice would be to say that the refinery assets were valueless. ECI shut down its business, closed the refinery and tried to abandon the refinery and the refinery assets. Costs of refinery dismantlement and environmental clean-up have been visited upon the estate by this Court. But case law precludes hindsight, perfect though that vision may be, so the inquiry as to value needs greater analysis.

It is a fundamental concept that the best evidence of what a property is worth is what it brings on the open market. The

ECI refinery was offered for sale on the open market from late 1980 through most of 1981. It was actively marketed and inquiries were directed to about 60 different companies. The ECI sales and marketing effort did not bring one firm offer from any possible purchaser of the refinery or the refinery assets.

There were only two entities which seriously and actively engaged in discussions with ECI about a possible deal for the refinery. Those two entities were Oasis Petroleum Corporation and Syncrude, Inc. And of those two entities, only Oasis conducted a due diligence study, a study necessary to an informed judgment about the wisdom of buying the refinery.

Oasis and ECI signed a preliminary letter agreement on March 12, 1981 under which Oasis had 60 days to complete its due diligence study of ECI's refinery operations. On May 11, 1981, after an extensive study of the refinery, Oasis declined further interest in the refinery with the following language in a letter to William P. Siderius, ECI president:

> (A)fter diligently investigating the acquisition of your refinery we have come to the conclusion that, due to its high rate of energy consumption, we would be unable to operate it economically.... Again, we regret that our technical evaluation of the project forced this decision.

Plaintiff's Exhibit 36. Siderius' request that Oasis reconsider its decision fell on deaf ears.

The second serious inquiry about the ECI refinery, and one which occupied a good portion of the trial, involved a company called Syncrude, Inc. Syncrude, Inc. had essentially two principals behind it, an oil consultant named Thomas P. Brown and a lawyer named Peter H. Kruse. The idea behind the formation of Syncrude, Inc. was to develop and market synthetic crude which was to be an upgrade of lower quality crude. The synthetic crude business never took off because, among other things, the synthetic process envisioned was costlier than the regular oil refining process.

Syncrude, Inc. had been dormant for about 3 years at the time Brown started looking into the ECI refinery in early 1981. Syncrude, Inc. did not have the capital to finance a purchase of the ECI refinery and so Brown explored the possibility of purchase in conjunction with the Henry Crown Company. A variety of proposals were discussed and it was clear, based on these proposals, that the actual purchaser was to be a no-asset company.

The material evidence about the Brown/Crown discussions with ECI results in the following conclusions:

1. no firm offer was ever put forward for or on behalf of the Brown/Crown group (a firm offer being defined as one which, if accepted, would constitute a binding obligation for the sale and purchase of the refinery);

2. no due diligence study was ever conducted by or on behalf of the Brown/Crown group;

3. the Brown/Crown proposals were all highly leveraged and involved limited liability on the part of the Brown/Crown group. Indeed, at one point Brown urged that a letter of intent be forwarded to ECI on Crown letterhead stationery, but Crown declined to use Crown stationery prior to an agreement being reached with ECI. It is clear Crown sought to avoid any legal obligation flowing from the advancement of its proposal;

4. the interests of Brown, Kruse, and Syncrude, Inc. were never formalized or mutually agreed upon with the Crown group, and the legal rights and obligations (which included important subjects such as reimbursement for costs to Brown, compensation for Brown, funding for a due diligence study, and equity positions of each) were never established.

The Crown group never put up funds so that a due diligence study could be undertaken, even though Brown asked that this and other investigatory expenses be budgeted and provided. Lacking that, no serious proposal was ever put forward by the Brown/Crown group. Every proposal floated by them contained significant conditions precedent to any firm offer or agree-

ment, and these conditions were never satisfied. In fact, during the discussions with ECI, Brown told a Crown official that they should go forward in investigating a refinery Texaco owned in Lockport, Illinois because, "in many, respects, it is a better refinery." Plaintiff's Exhibit 201. More about the Texaco refinery later.

In short, none of the evidence involving the Brown/Crown discussions with ECI officials or any of the non-binding and highly contingent proposals put forward by that group affords a reliable basis for the view that the ECI refinery had material commercial value at the relevant preference periods. While it is certainly prudent business practice to try and structure a deal on the best possible financial terms and with the least possible risk, features of all of the Crown group's bargaining positions, there was a failure or unwillingness to do either of the following:

1. expend the funds and resources necessary to conduct a due diligence study (as Oasis did);

2. make a definite and firm offer, whether subject to a due diligence study or other conditions, which was capable of being accepted so as to bind the parties in some way.

More than anything that was opined at trial about the value of the ECI refinery by the Brown/Crown witnesses, failure to take the above necessary steps to the consummation of a transaction says much about the risk and costs they were willing to assume. If the ECI refinery was worth all that much to the Brown/Crown group, we can be assured that they would have been willing to put something on the table. That was never done, and actions have always been better evidence of intentions, and in this case value, than words.

The preference defendants contend that the sales efforts by ECI were totally unrealistic and completely unprofessional and that each of these conditions contributed to ECI's failure to sell the refinery. While it is true that ECI had certain hopes and expectations in terms of a sales price—all sellers of property necessarily do—the fact remains that no offers to buy the refinery

were received by them so as to test their expectations. Additionally, it is necessary to consider other evidence presented to determine whether there were other, and more compelling reasons, to explain why the ECI refinery was not sold.

An essential first step in testing the preference defendants' contention that ECI's own conduct prevented the sale of the refinery is to examine the climate for the oil industry and for oil refineries during the relevant period. And the place to start that examination is with the testimony of David K. McKown of the First Boston Corporation, a major creditor of ECI and the entity ECI first turned to for advice about the sale of the refinery. McKown testified that the refining industry was generally chaotic in later 1980 and early 1981 because of the oil crisis of the late 1970's and the imminent end of the U.S. Government's entitlement program. Oil consumption was declining as capacity increased, with the result that many small refiners went bankrupt. Bank documents reflect an "overall pessimism pervading the small independent refinery industry." ECI was unable to realize operating profits for a variety of reasons and "it was bleeding to death." McKown thought the value of the ECI refinery was close to zero and predicated his opinion on the following reasons:

1. the ECI refinery had lost a great deal of money;

2. industry capacity was well in excess of demand;

3. numerous other refineries were in trouble and there were no buyers.

In a word, McKown thought that the ECI refinery was a "dog." McKown told the Member–Owners in May, 1981 that there was almost no chance the plant would be sold.

It is undisputed that the climate for refineries was poor—even abysmal. The evidence established that numerous refineries were shut down. (See plaintiff's exhibit 124 and the deposition testimony of Bernard A. Paulson, President of Koch Refining, a preference defendant, confirming the shutdown of over 100 refineries). Interestingly enough, one of the preference defen-

dants, Texaco, Inc., also had the misfortune of having to close down one of its refineries, after being unable to sell it, during a time period similar to ECI's attempted sale. The evidence relating to the Texaco refinery is particularly relevant to the question of the value of the ECI refinery for the following reasons:

1. the Texaco refinery was located in Lockport, Illinois and was, therefore, in the same geographic region as the ECI refinery in East Chicago, Indiana;

2. the Texaco Lockport refinery had a Nelson complexity factor of 8.5 and, in many respects, was thought to be a better refinery than ECI by the Crown group;

3. the Crown group explored the possibility of purchasing the Texaco Lockport refinery but never did so;

4. in April, 1981, Texaco estimated that the replacement cost with new facilities for the Lockport refinery was from $550 million to $600 million;

5. Texaco retained E.F. Hutton & Co. to assist in marketing the Lockport refinery (presumably, Texaco's and E.F. Hutton's expectations were not totally unrealistic nor their efforts completely unprofessional);

6. Texaco's attempts to sell the Lockport refinery were unsuccessful. In fact, the only "offer" received by Texaco is unworthy of being called an offer. The offer was from the Joliet Port District and, among other things, provided for no down payment and was subject to the District's ability to secure a group of investors and users that would generate the necessary income to perform the contract. Some offer;

7. the Lockport refinery was written down to salvage value on Texaco's books and a plant once estimated to cost about $600 million to reproduce was carried on the balance sheet at $594,691.55. Although sought to be excluded from evidence by the defendants on relevance grounds, this Court finds the facts and circumstances surrounding the Texaco Lockport refinery to be probative on the question of the value of the ECI refinery during the relevant 90 day period.

The following facts are what the clear and objective evidence discloses in this case:

1. Although offered for sale, the ECI refinery was never sold.

2. No firm offer was ever received from any prospective purchaser of the ECI refinery.

3. The oil refinery business climate was extremely poor, based on the following:

(a) excess industry refinery capacity;

(b) declining demand for petroleum products;

(c) termination of the U.S. Government's entitlements program (a program which benefitted ECI);

(d) dozens, perhaps even hundreds, of U.S. refineries being shut down.

(e) a refinery superior in many respects to the ECI refinery and located in the same geographic area could not be sold and was shut down by Texaco, one of the preference defendants.

4. the ECI refinery had sustained substantial losses throughout its operating life and its economic performance experience was below industry standard.

Against this backdrop of *fact* clearly established by the evidence, the defendants rely on *opinion* testimony to establish that the ECI refinery had substantial value and was worth at least $115 million as a going concern. The defendants rely on the expert opinion testimony of Sam Harris, Thomas Brown and Robert G. Anderson for this assertion.

Sam Harris has been a petroleum engineer since 1942 and held a variety of important positions in the oil refining business during his career. Coincidentally, Mr. Harris was retained by Oasis Petroleum in connection with the Oasis due diligence study of the ECI refinery and visited the refinery as part of his duties. What is significant about Mr. Harris' opinions is that they were not opinions about the fair market value of the refinery or what it could, or should, sell for. Mr. Harris offered opinions of the ECI refinery on a discounted replacement basis, with the dis-

count based on the age and condition of the refinery's component parts. Mr. Harris did not consider actual or future developments in the industry such as refining capacity, demand for refined products, ECI's history of losses or its high rate of energy consumption.

In some circumstances, discounted replacement cost may be a significant consideration in the value of an asset, but this is not one of those circumstances. As the Texaco officials can surely attest, the fact that it would cost hundreds of millions of dollars to duplicate the Lockport refinery did not provoke one decent offer for the purchase of it by any buyer in the marketplace.

Tom Brown testified both as a fact witness in connection with the Syncrude/Brown/Crown negotiations and as an expert in the oil industry. It is important to note that neither Brown, Kruse nor Syncrude, Inc. had the financing to do a deal with ECI. Whatever financial support was needed, Brown looked to the Crown group to supply it. As previously discussed, the Crown group neither made a firm offer nor took any other action placing themselves at financial risk in these discussions. Notwithstanding his trial testimony suggesting the contrary, Brown and the Crown group did not like the ECI refinery enough to buy it, make a firm offer to buy it, commit to a down payment on a purchase price, or to significantly investigate it (due diligence) for a possible purchase. In addition to that, they clearly liked the Texaco Lockport refinery better, but they did not buy that one either.

Fairly read, the various Brown/Crown proposals were heavy on contingencies and conditions and light on cash and commitment. Brown's own arrangement with Crown was never formalized and while Brown kept looking to Crown to put up the seed money to explore the possibility of a deal, Crown never did so. While the ECI folks were also trying to make the best deal they could for themselves, leading to an inordinate amount of verbal waltzing in their discussions with Brown/Crown, it can only be said that these were most preliminary proposals.

■ As stated earlier, a sale is the best evidence of the worth of a property. Short of that, a firm commitment to buy at a certain price would be entitled to considerable probative value. Neither of those conditions are present here. As such, the Brown/Crown evidence is entitled to little weight on the question of value. Particularly is this so in light of the other objective evidence in this case bearing more precisely on the issue of the refinery value.

Robert Anderson is consulting engineer and was experienced in various facets of the oil business, including the valuation of refineries. Indeed, while employed with the consulting firm of Purvin & Gertz, he participated in a major study and evaluation in 1980 of the petroleum operations of Farmers Union Central Exchange, Inc. (Cenex). Cenex was one of the farm cooperative Member–Owners of ECI and, as such, had an equity position in ECI. Cenex also had interests in two other refineries in 1980, wholly owning one and partially owning a second in addition to its partial ownership of ECI. Mr. Anderson also did a study of the ECI refinery and completed a report dated December 1988. The 1988 report is entitled, "ECI Refinery, 1981 Discounted Earnings Valuation."

As the title of the 1988 report suggests, the report and evaluation prepared for the trial of this case was done on the basis of discounted earnings. Anderson testified that this valuation method involved making assumptions about capacity utilization, expected operating costs including costs of crude, future interest rates and a revenue stream based on certain pricing assumptions. Anderson did not do a comparable sales analysis. It was his view that refineries are too dissimilar to compare in this way, although acknowledging that comparable sales analyses had been done in the past by his firm. Anderson also failed to conduct an analysis of actual efforts made to sell the ECI refinery in late 1980 or early 1981. Additionally, Anderson testified though that even if a firm offer had been made for the ECI refinery, that would

not be the most relevant factor in a fair market valuation. Only if Anderson concluded that an offeror knew what he was doing would an offer to purchase be considered by him. Anderson did not look at the availability of other refineries on the market in his valuation opinion. In the Court's view, trying to determine the fair value of a refinery by ignoring sales efforts for the refinery in question, discounting the probative value of the lack of a firm offer received and ignoring the actual experience in the refinery marketplace as regards sales and shutdowns of other refineries is a particularly myopic way to form an opinion.

Anderson's minimum value for the ECI refinery, based on the host of material assumptions he made, was $80 million. Interestingly, in his 1980 study for Cenex, he concluded that:

> The ECI refinery operation is expected to provide least benefit to Cenex members. The ECI refinery has better access to foreign crude than Laurel, but is totally dependent upon these foreign crude supplies. The refinery is not particularly well-suited in terms of processing capability to adopt to the industry trends toward lighter product yields and heavier, higher sulfur crude oil supplies. ECI operating costs are quite high by industry standards. It is expected that substantial capital investment will be necessary to upgrade processing capability and reduce operating costs. If Cenex is able to fully utilize the Laurel refining capacity with secure, reasonably priced crude oil, the ECI refining capacity will be surplus to projected requirements.

In October 1980, Anderson and his team of experts thought the ECI refinery was the worst of the three refineries Cenex was involved with and that Cenex should get rid of their interest in it if the opportunity presented itself. It is worthy of note that the October 1980 report was prepared at a time the instant litigation, and Anderson's role as an expert witness offering opinions as to the substantial value of the ECI refinery, was neither foreseeable nor an influence on the conclusions then reached. What a difference time and the status as

an advocate's expert has ordained in the opinions held and expressed.

Of course, Anderson was not the only witness who offered opinions at trial which had a different flavor than those held at a time when the instant litigation, and one's role in it, was not an influence. Christopher Ross testified as an expert for the Trustee that the ECI refinery had no commercial value at any time during the relevant preference period and that no buyer would pay anything for it. In February, 1981, Mr. Ross participated in a study entitled, "The Outlook for U.S. Refining" for a client considering a refinery purchase during that period. Although Ross recommended against purchasing a refinery, the information affecting the ECI refinery, while not rosy, was not as catastrophic as the testimony offered up at trial.

■ In this case, as in many others recently, the concept of an "independent expert" has been severely wounded. There appears to be an increasing willingness on the part of experts retained for trial to testify in accordance with the wishes of the party retaining them, with not even the slightest momentary embarrassment or apology for having offered an opinion at a much earlier time different than that effected by an appropriate retainer. These trial opinions should be seen for what they are—purchased testimony—and not affording a level of confidence sufficient to enable a fact-finder to rely on them. Professional integrity is being comprised and, in this case as in others, findings must be predicated on objective, clear or reliable evidence rather than "independent expert" opinion as presented here by both sides.

■ The bankruptcy of a method of valuation which relies upon future assumptions of the most important stripe can be found in the following testimony of Mr. Anderson. Anderson projected prices for finished products sufficient to result in a "15% recovery on capital before general administrative, before capital expenditures, before tax, and before depreciation." Transcript at 849. The projection for product sales prices "would result in 15% cash

available for a variety of things, including return on investments ..." Transcript at 850. Anderson testified that if projected operating costs had been higher, he would have raised the projected gross margin to cover those costs and still get a 15% return. He conceded, however, that a 15% to 20% discounted cash flow return was not actually being seen, but that is what he expected. Transcript at 851 (underscoring added). And when asked whether it was true that the ECI refinery was not achieving anything close to these returns on its actual operations, Anderson said, "I didn't make a thorough study of the prior financial performance of ECI." Transcript at 851. Anderson was not about to let some basic facts get in the way of a good valuation model.

At bottom, Mr. Anderson's discounted earnings method of valuation rests, for its validity, on the reliability of the assumptions which underlay the conclusions. The extent to which the assumptions can be tested by real events and real experience bears heavily on the degree to which reliance should be had. In some cases, comparable real events and transactions do not exist so as to exalt the assumptions driving the conclusions. In other cases, the existence of a free and open market with informed buyers and sellers is present so as to provide a ready test for the accuracy of the results produced by the discounted earnings method. There is simply no substitute in measuring value than to analyze what informed buyers are willing to accept, informed sellers are willing to pay, and with neither group under a compulsion to act.

We had such a marketplace in this case. The ECI refinery was offered for sale to the world in a highly informed marketplace, and the only thing it fetched was a single Nigerian dollar. In the last analysis, all sophisticated valuation methods must yield to the realities of the marketplace. ECI brought exactly what it was worth.

To recap, the cold, hard, indisputable facts—not biased opinion—established by the evidence in this case are as follows:

1. The ECI refinery was a sorry financial operation and had incurred substantial operating losses during the entire period of its existence.

2. In 1981 U.S. oil consumption was declining even as oil capacity was increasing.

3. The refining industry was chaotic for a variety of reasons, many of which involved events in the Middle East.

4. The U.S. Government's entitlement program ended which resulted in financial harm to a number of U.S. refineries, including ECI.

5. The ECI refinery was offered for sale and actively marketed during the period preceding the preference period, during the preference period, and after the preference period. The ECI refinery was never sold.

6. No firm offers were received for the ECI refinery and the only putative buyer to conduct a due diligence investigation declined to make any offer to purchase after the completion of the investigation.

7. The ECI refinery was ultimately shut down and dismantled (after the relevant preference period), and was but one of many refineries to suffer the same fate.

8. The oil industry experienced numerous other shutdowns of refineries throughout this same general period; there were well in excess of 100 shutdowns.

9. Texaco, Inc., one of the preference defendants, had to shut down one of its own refineries located close to the ECI refinery after failing to sell it on the open market (around the same time the ECI refinery was for sale) or even receiving a meaningful offer for it.

The only reasonable conclusion compelled from all of the evidence is that the ECI refinery had no value at any time during the 90 day preference period. Because of that, ECI was insolvent each and every day of the entire 90 day preference period.

### III. *Miscellaneous Matters*

Because of the Court's conclusion that the ECI refinery had no value at the rele-

vant times, rendering ECI hopelessly insolvent, it is unnecessary to decide issues relating to other assets and liabilities on ECI's balance sheets. No matter the outcome of those issues, none of them, singly or collectively, can place ECI in a solvent status. A brief word about two of them is appropriate, however.

■ Because of ECI's substantial net operating losses, the defendants contended that the minimum value of $80 million put on the ECI refinery should be increased to at least $115 million to reflect the value of those losses to a prospective purchaser. This contention lacks merit for a number of reasons. In the first place, the witness who supplied the incremental value of $35 million to the plant by virtue of these losses did not have a sufficient background on the matter of net operating losses to offer a valid opinion as to their marketability. Secondly, there was no evidence that a potential buyer either considered those losses or was otherwise influenced by them. There was also no evidence that this was a material consideration by the Crown group, evidence otherwise relied on heavily by the defendants. Thirdly, it was manifest that the Internal Revenue Service took a position in opposition to a buyer using net operating losses which were comprised principally, if not exclusively, from sales to cooperatives who made up the ownership of ECI.

It is doubtful that a buyer would pay much for the right to fight the IRS in tax litigation whose outcome was unclear but which posed considerable financial risk to such buyer. A buyer would have his hands full trying to make ECI profitable—buying major litigation would have been too much to ask. In any event, there is no evidence any buyer seriously thought about it. And the last major impediment to concluding that the net operating losses had value to a buyer was the necessity to generate future profits so as to have something to offset the losses against. Given ECI's operating history, that was a dubious proposition. Consequently, opinion testimony that ECI's net operating losses were worth at least $35 million to a buyer (in addition to the

$80 million this same buyer would pay for the refinery itself) is unpersuasive in light of the other non-opinion evidence in the case. Nobody bought the refinery or thought enough of it to make an offer. It may well be that those staggering losses caused this disinterest rather than instilling interest and inspiring an offer.

■ James Naus, the defendant's accounting expert, made an adjustment to ECI's balance sheet of February 28, 1981 reflecting receivables due from the Member–Owners as approximately $48 million rather than the $30 million which appeared on ECI's books. Peat Marwick, ECI's outside auditors, used the figure of $30 million as reflecting the value of this asset to ECI. Although aware of the ECI—Member–Owner litigation, Naus made no attempt to evaluate this litigation, the Member–Owner affirmative defenses or their counterclaims. Indeed, Naus was unqualified to do so.

Mr. Naus refused, in his testimony, to concede that a fair market value purchaser of ECI would evaluate the length, complexity and costliness of the litigation between the Member–Owners and ECI in order to determine what a fair value of this asset was during the relevant time. Failure to do so is to deny the obvious. Additionally, given the complex nature of the hostilities between the parties and the length and expense of the ensuing litigation between them, it cannot fairly be said that the sum of $48 million was not only due from the Member–Owners at February 28, 1981 but was readily convertible to cash within a reasonable period of time. Although in some other respects Mr. Naus' adjustments were appropriate, this one was not. As concluded earlier, however, neither this adjustment nor others made by Mr. Naus lifted ECI into a state of solvency.

## IV. *Summary*

The overwhelming credible evidence in this case establishes that ECI was hopelessly insolvent during the entire period of 1981 preceding the bankruptcy petition filing date of May 15, 1981. This is true when measured by the events known to exist at the time and not by later events.

The perfect vision of hindsight merely buttresses the conclusions otherwise readily apparent. It was no fluke that ECI went bankrupt in 1981 and it was neither unexpected nor extraordinary that the refinery was shut down. It had plenty of company.

The short answer to the defendants contention that the ECI refinery was worth at least $80 million in early 1981 is that nobody else thought so. The marketplace in 1981 was the means by which the opinions offered in a 1988 trial on value are to be tested. Whatever the reasons for ECI's poor operating performance, whether poor management, charging the wrong prices, or other such assertions, the fact is that nobody was willing to take a financial risk to prove that it was, indeed, a good refinery under different management. Today's words, like today's opinions, simply cannot contradict yesterday's actions. In 1981, the ECI refinery was worth exactly what it brought on the open market, one Nigerian dollar. The preference defendants' contention that ECI was solvent during the preference period is contrary to the evidence and defenses based on that contention are, accordingly, denied.