**In re ALPER–RICHMAN FURS, LTD., Debtor.**

**Catherine STEEGE, as trustee for Alper–Richman Furs, Ltd., Plaintiff,**

v.

**AFFILIATED BANK/NORTH SHORE NATIONAL, Defendant.**

**Bankruptcy No. 89 B 05933. Adv. No. 90 A 0430.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 26, 1992.

Catherine Steege, Jenner & Block, Chicago, Ill., trustee.

Paula Jacobi, Schwartz, Cooper, Kolb & Kaynor, Chicago, Ill., for Affiliated Bank and North Shore Nat.

MEMORANDUM, OPINION
AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter comes before the Court on cross motions for summary judgment brought under Fed.R.Civ.P. 56, made applicable to adversary proceedings in bankruptcy cases by Fed.R.Bankr.P. 7056, in connection with the eight count complaint brought by the Chapter 7 Trustee, Catherine Steege, against Affiliated Bank. For the reasons stated below, this court grants summary judgment for the Bank on Count I of the Trustee's complaint, but denies summary judgment on Counts II–VI.[1]

### FACTS

The Debtor was a retail furrier in Chicago, Illinois. The Debtor first began borrowing money from the Bank, with which it had its deposit accounts, in 1980. Over the next eight years, the Bank increased its loans to the Debtor. The Bank also made personal loans to Mr. Burton Alper, president and sole shareholder of the Debtor, and his wife. All of the Bank's loans to the Debtor and Mr. Alper and his wife were unsecured.

The Debtor obtained its inventory from trade vendors by using "trade acceptances." When a trade acceptance became due, the vendor deposited the trade acceptance in its bank, and the vendor's bank presented it to the Bank for payment. The Bank, in turn, sent the Debtor a collection letter, identifying the vendor, the amount owed and the due date. The Debtor then forwarded to the Bank a check payable to the Bank and marked with the trade acceptance or collection notice number to identify the trade acceptance being paid. The Bank then paid the appropriate vendor. The Debtor used this system to purchase and pay for its inventory at all relevant times.[2]

---

1. On Count VI, the Trustee moved for summary judgment, but the Bank did not. On Count VII, neither party moved for summary judgment.

2. Boiled down to the basics, a trade acceptance is nothing more than a promise given by the Debtor to one of its vendors to pay the debt

In December 1986, Alper formed Just Furs, Inc. to do business as a discount furrier. Just Furs obtained its inventory directly from the Debtor. The Bank financed Just Furs' operation with a $1 million loan secured by a blanket lien on all of Just Furs' inventory and receivables. The Bank perfected its security interest in Just Furs' assets by filing a financing statement on June 3, 1987.

As a result of the capital expenditures made to get Just Furs started, the Debtor was unable to repay its loans to the Bank in 1986. In January 1987, Alper asked the Bank for additional financing. The Bank agreed to lend additional money to the Debtor. As a condition of the additional financing, the Bank required Alper and Just Furs to guaranty all of the loans the Debtor owed the Bank. The Bank still took no security interest in the Debtor's assets.

From January 1987 to April 1988, the Debtor made its monthly commercial loan payments to the Bank fairly regularly. However, beginning in April 1988, the Debtor's payments to the Bank began to become sporadic. The payments the Debtor did make varied widely in amount.[3]

On April 10, 1989, an involuntary Chapter 7 bankruptcy petition was filed against the Debtor. At the time of the petition, the Debtor owed the Bank over $900,000. On April 19, 1989, the Debtor converted the involuntary Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code.

On June 16, 1989, the Bank filed a motion to modify the automatic stay to permit the Bank to enforce its security interest against Just Furs' inventory. The Debtor failed to properly respond to the Bank's motion. The court, relying on a representation by the Bank's counsel that the Debtor had no objection to modifying the stay to allow the Bank to enforce its claim against Just Furs' inventory, lifted the stay as to all inventory owned or held by Just Furs.

On July 20, 1989, the Bank and Burton Alper entered into an agreement under which the Debtor released the inventory located at Just Furs to the Bank, and the Bank agreed not to assert a claim to any future inventory located at Just Furs. Shortly thereafter, the Bank took possession of Just Furs' inventory.[4] On January 26, 1990, the Debtor converted the Chapter 11 case back to a Chapter 7 case. The United States Trustee appointed Catherine Steege as interim trustee in the Chapter 7 case. When the creditors failed to elect a trustee, Steege became the permanent trustee in the case. See § 702(d).

On May 25, 1990, the Trustee initiated the instant adversary proceeding against the Bank, claiming that the inventory seized by the Bank was consigned to Just Furs by the Debtor and that accordingly the Debtor's interest in that inventory was superior to that of the Bank. In addition, the Trustee seeks to have the Bank held liable for conversion, and to have the Bank's claim equitably subordinated because of the Bank's alleged misconduct in connection with the motion to lift the stay. The Trustee also seeks to recover all payments made by the Debtor to the Bank within the year preceding the involuntary petition, claiming: (1) the $662,188.65 in trade acceptances were avoidable preferences; (2) the $116.517.88 in commercial loan payments were avoidable preferences; and (3) the $775 payment made by the Debtor to the Bank on April 28, 1988 on a personal loan of Alper's wife was both a fraudulent conveyance and preferential. Both the Trustee and the Bank have moved for summary judgment.

---

owed the vendor. It is closely analogous to a draft or check.

**3.** On April 11, 1988, the Debtor paid the Bank $7,545.57; on July 22, $26,199.36; on November 9, $10,000; on December 22, $30,000; on January 1, 1989, $16,954.88; and on January 23, 1989, $25,000.

**4.** After taking possession of the inventory, the Bank entered into a liquidation agreement with National Traders, Inc. ("NTI") and Just Furs pursuant to which the Bank recovered fifty percent of the cost of each coat when sold. NTI and Just Furs split the proceeds of any sale exceeding fifty percent of the cost. It appears that virtually all of the inventory in question has been sold to unrelated third parties.

## JURISDICTION AND PROCEDURE

This court has jurisdiction over this matter under 28 U.S.C. § 1334(b) as a matter arising, *inter alia,* under §§ 510, 544, 547 and 548 of the Bankruptcy Code. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (F), (H) and (K) as a proceeding involving the determination of the validity, extent or allowance of liens as well as a proceeding to recover alleged preferences and fraudulent conveyances. This proceeding is before the court pursuant to Local Rule 2.33 of the United States District Court for the Northern District of Illinois automatically referring bankruptcy cases and proceedings to this court for hearing and determination.

## STANDARD FOR SUMMARY JUDGMENT

Under Fed.R.Bankr.P. 56(c), made applicable to bankruptcy proceedings by Fed. R.Bankr.P. 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). On a summary judgment motion, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### I. *The Bank's Lien*

Counts I–III of the Trustee's complaint focus on the Bank's lien against Just Furs' inventory. Specifically, Count III asserts that the priority of the Bank's lien on the inventory at Just Furs is junior to the Debtor's interest in that inventory. Count I claims that the Bank converted property of the Debtor in enforcing its alleged lien on that inventory. Count II asserts that the Bank's claim against the Debtor should be equitably subordinated because of alleged misconduct by the Bank in connection with the Bank's motion to lift the stay.

### A. The priority of the Bank's lien

The Trustee argues that she should be granted summary judgment because, as a matter of law, the Debtor's interest in the inventory seized by the Bank is superior to the Bank's lien.[5] The Trustee's claim is based on the allegation that the Debtor consigned the inventory seized to Just Furs and Ill.Rev.Stat. § 2–326 works to give the Debtor, as a consignor, priority over the Bank.[6] The Trustee says that the Bank's lien is junior to the Debtor's interest be-

---

**5.** Of course, the Trustee, as successor to the Debtor, succeeds to whatever interest the Debtor had in the inventory on the date of the petition, since that interest becomes property of the estate. *Matter of Sanders,* 969 F.2d 591, 593 (7th Cir.1992).

**6.** Ill.Rev.Stat. § 2–326 provides, in pertinent part:

. . . . .

(2) Except as provided in subsection (3), ... goods held on sale or return are subject to [the claims of the buyer's creditors] while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the per-

son conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

**148**

cause: (1) it was generally known that Just Furs operated on a consignment basis; or (2) the Bank knew that the inventory seized was consigned by the Debtor to Just Furs. Of course, the Bank takes the position that the Trustee has failed to prove any consignment arrangement, and, even if there was a consignment, that the Bank retains a superior interest in the inventory seized under Ill.Rev.Stat. § 9–114.[7] To resolve the priority question, this court must answer three questions: (1) whether there was a consignment arrangement between the Debtor and Just Furs; (2) if so, whether, as a matter of law, a consignor who fails to file an Article 9 financing statement relating to consigned goods can have better rights to such consigned goods than a properly perfected secured creditor of the consignee; and (3) if so, whether the Trustee has established facts sufficient to give the Debtor a superior interest in the inventory notwithstanding the fact that the Debtor as consignor failed to file a financing statement, while the Bank has a properly perfected security interest.

**(1) Was there a consignment arrangement between the Debtor and Just Furs?**

The initial question this court faces is whether the inventory taken and sold by the Bank was in fact consigned by the Debtor to Just Furs. The evidence adduced by the Trustee in support of her summary judgment motion makes it absolutely clear that a consignment arrangement existed between the Debtor and Just Furs. Alper unequivocally testified at his deposition that the Debtor owned all of the merchandise located at Just Furs. Plaintiff's Exhibits 29 at 79, 6 at 43, and 14 at 30–31. Two independent auditors' reports provide support for that assertion. *See* Plaintiff's Exhibits 12 and 30.[8] Indeed, a field audit report prepared at the request of the Bank specifically identifies the Debtor as the owner of Just Furs' inventory, stating that Just Furs held the inventory on consignment. *See* Plaintiff's Exhibit 25. The Bank has produced no evidence sufficient to challenge the Trustee's evidence with respect to a consignment arrangement. Thus, there is no genuine issue of material fact with respect to the arrangement between the Debtor and Just Furs: it was a consignment arrangement.[9]

**(2) As a matter of law, can a consignor who failed to file an Article 9 financing**

7. Ill.Rev.Stat. § 9–114 provides, in pertinent part:

(1) A person who delivers goods under a consignment which is not a security interest and who would be required to file under this Article by paragraph (3)(c) of Section 2–326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee ... if

(a) the consignor complies with the filing provision of the Article on Sales with respects to consignments (paragraph (3)(c) of Section 2–326) before the consignee receives possession of the goods; and

(b) the consignor gives notification in writing to the holder of the security interest if the holder has filed a financing statement covering the same types of goods before the date of the filing made by the consignor; and

(c) the holder of the security interest receives the notification within 5 years before the consignee receives possession of the goods; and

(d) the notification states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

(2) In the case of a consignment which is not a security interest and in which the require-

ments of the preceding subsection have not been met, a person who delivers goods to another is subordinate to a person who would have a perfected security interest in the goods if they were property of the debtor.

8. Laventhol and Horwath conducted audits of the Debtor in both 1987 and 1988. Each audit report explicitly states that the Debtor provided inventory to Just Furs on a consignment basis.

9. The Bank claims that because there was no written consignment arrangement, any such arrangement must fail under the Statute of Frauds. *See* Ill.Rev.Stat. § 2–201. The Statute of Frauds, however, is riddled with exceptions. One such exception is Ill.Rev.Stat. § 2–201(3)(c), which dismisses any requirement of a writing where a purchaser has received and accepted goods. A purchaser is defined as including a person who takes by sale. *See* Ill.Rev.Stat. § 1–201(32), § 1–201(33). A consignment is considered a sale. *See* Ill.Rev.Stat. § 2–326(1). Thus, Just Furs, the consignee here, was a purchaser. Furthermore, Just Furs regularly accepted goods from the Debtor, the consignor. *See* Ill. Rev.Stat. § 2–606 (defining acceptance of goods). Consequently, the § 2–201(3)(b) exception to the Statute of Frauds applies. No writing was required to evidence the consignment arrangement between the Debtor and Just Furs.

statement relating to consigned goods have better rights to such consigned goods than a properly perfected secured creditor of the consignee?

Ill.Rev.Stat. § 9–114 provides in general that a creditor of a consignee with a properly perfected security interest in the consignee's inventory takes priority over the consignor of goods with respect to those goods if the consignor would be required to file an Article 9 financing statement under § 2–326(3) and fails to do so before the consignee receives possession of the goods. Viewing § 9–114 in isolation seems to lead to the conclusion that the Bank has rights to the consigned goods superior to those of the Debtor, because the Debtor did not make any filing before consigning inventory to Just Furs.

That conclusion, however, is undermined by the fact that § 2–326(3)(c) provides several exceptions to the rule that a properly perfected secured creditor of the consignee takes over a consignor who fails to file. Section 2–326(3) provides that consigned goods are subject to the claims of a perfected secured creditor of a consignee unless the consignor: (1) complies with a sign law; (2) establishes that the consignee is generally known by its creditors to be substantially engaged in selling the goods of others; or (3) files an appropriate financing statement.

Obviously, there is no sign law involved here, and clearly the Debtor never filed a financing statement. Nevertheless, under § 2–326(3), it would appear the Trustee could succeed in establishing the priority of her claims over the Bank's lien if she can prove that Just Furs was generally known by its creditors to be substantially engaged in selling the goods of others.

Thus, § 2–326(3) and § 9–114 of the Uniform Commercial Code seem to lead to absolutely contradictory results in the instant proceeding. At first glance, they appear to be mutually exclusive. They seem like two ships that pass in the night. Although they deal with the same subject—rights in consigned goods—the drafters of each provision seem to have been unaware of the other. However, upon further anal-ysis, it becomes clear that § 2–326(3) and § 9–114 of the UCC are integrated and together set out an organized procedure for dealing with informed consignment arrangements such as the one now before this court.

■ The only logical conclusion this court can reach is that § 9–114 does not apply where § 2–326(3) does. § 9–114 provides that a perfected secured creditor of a consignee has priority over a consignor with respect to consigned goods if a consignor "who would be required to file" under Article 9 *by § 2–326(3)* fails to file. However, a consignor is not required to file by § 2–326(3) (1) compliance by the consignee with an applicable state sign law; or (2) general knowledge by the consignee's creditors that the consignee is generally engaged in the business of selling goods on consignment.

The plain language of § 9–114 leads to the conclusion that § 9–114 is meant to apply only where the two exceptions listed in § 2–326(3) do not apply. When that is so, the language of the rest of § 9–114 comes into play, and the consignor is required to file under Article 9 to prevent the consigned goods from becoming subject to security interests of the consignee's creditors. In other words, as against the consignee's creditors, the consignor who fails to file a financing statement has priority to the consigned goods if either of the § 2–326(3) exceptions applies; otherwise, § 9–114 applies, and the consignee's secured creditors have priority.

This view is in accord with the Uniform Commercial Code's mandate against reading its provisions to render other provisions meaningless. *See* § 1–104. The majority of courts considering the issue have also adopted this view. *See, e.g., In re State Street Auto Sales*, 81 B.R. 215, 217–18 (§ 9–114 should be limited to situations where the other exceptions to § 2–326(3) do not apply, noting that "most courts and commentators" have so held); *Matter of Great American Veal, Inc.*, 59 B.R. 27, 32 (Bankr.D.N.J.1985) (§ 9–114 does not apply where other exceptions to § 2–326(3) do);

*In re Lebus–Albrecht Lumber Co.,* 38 B.R. 58, 61 (Bankr.D.N.D.1984) (same).[10]

Thus, this court holds that a consignor may have superior rights to consigned goods than those of a properly perfected secured creditor of the consignee, notwithstanding the fact that the consignor filed no financing statement with respect to the goods, if: (1) the consignor complied with any applicable state sign law under § 2–326(3)(a); or (2) it was generally known to the consignee's creditors that the consignee acquired its inventory on a consignment basis under § 2–326(3)(b). The burden of proving compliance is on the consignor. *In re BRI Corp.,* 88 B.R. 71, 74–75 (Bankr. E.D.Pa.1988).

> (3) Has the Trustee adduced evidence sufficient to show that the creditors of Just Furs generally knew that Just Furs was substantially engaged in the sale of goods owned by others?

Thus, the Trustee prevails, as a matter of law, and thus should be granted summary judgment, if she can prove that either: (1) the Debtor complied with an applicable sign law; or (2) Just Furs was generally known to its creditors to be substantially engaged in selling the goods of others. As there is no applicable Illinois or federal sign law at issue here, the instant dispute revolves around the question of whether it was generally known to Just Furs' creditors that Just Furs was substantially engaged in selling the goods of others.

Of course, it is up to the Trustee to prove by a preponderance of the evidence that a majority of Just Furs' creditors knew that Just Furs was substantially engaged in selling the goods of others. *In re BRI Corp.,* 88 B.R. 71, 75 (E.D.Pa.1988). *See also In re Wicaco Machine Corp.,* 49 B.R. 340 (E.D.Pa.1984) (one-fifth of creditors knowing of consignment relationship does not satisfy Section 2–326 requirement).

The Trustee takes the position that most of Just Furs' creditors knew that Just Furs was substantially engaged in the business of selling the Debtor's goods because the Debtor and Just Furs' employees knew just how Just Furs got its inventory, and together those two parties represent 79% of Just Furs' creditors.

 This court cannot agree. First, the § 2–326(3)(b) majority test is measured by number of creditors, not amount of claims. *See Wicaco,* 49 B.R. at 343–44. In addition, even if the Debtor and the employees of Just Furs represented 79% of the total unsecured claims against Just Furs, this court does not believe the requirements of § 2–326(3)(b) would be met. The fact that the Debtor, from which Just Furs acquired its inventory, and Just Furs' employees, who accepted the inventory from the Debtor, knew the nature of Just Furs' business should be expected. This court would expect some evidence as to what Just Furs' other, unrelated creditors believed the nature of Just Furs' business was. The record reflects no evidence as to the knowledge of Just Furs' outside creditors. Instead, there is a genuine issue of material fact with respect to that question.[11]

---

**10.** The Bank claims that *Martin v. First National Bank of Joliet,* 127 Ill.App.3d 485, 82 Ill.Dec. 348, 468 N.E.2d 1002 (3 Dist.1984) supports the position that § 9–114 supersedes § 2–326(3). The Bank's argument is erroneous. In *Martin,* the court only considered the effect of failing to file under § 2–326(3); it never addressed whether the § 2–326(3) exceptions could serve to give a consignor of goods priority over a perfected secured creditor of the consignee with respect to such goods.

**11.** There is some evidence that the Bank knew at the time it took the security interest in Just Furs' inventory that Just Furs acquired its inventory from the Debtor on a consignment basis. If this is proven at trial, this court would

hold that the Bank is estopped from asserting its security interest in Just Furs' inventory to the extent that inventory was acquired from the Debtor on consignment. To rule otherwise would contravene the intent of § 2–326 and would sanction intentional conversions of goods or proceeds. *GBS Meat Industry Pty. Ltd. v. Kress–Dobkin Co.,* 474 F.Supp. 1357, 1362 (W.D.Pa.1979). § 2–326 was intended to apply to cases in which creditors of the consignee may reasonably be deemed to have been misled by a secret reservation of title by the consignor. Official Comment to § 2–326 at ¶ 2; *see also In re Gross Manufacturing and Importing Co., Inc.,* 328 F.Supp. 905, 909 (D.N.J.1971). To hold that a creditor of the consignee not in fact so misled could prevail would be contrary to the purpose

Thus, the court finds that summary judgment is inappropriate with respect to whether the Debtor's interest in the consigned goods seized by the Bank prevails over the Bank's security interest in those goods. There are two issues of material fact to be determined: (1) whether it was generally known to Just Furs' creditors other than the Bank that Just Furs acquired its inventory on a consignment basis; and (2) whether the Bank had actual knowledge that the inventory in question was consigned to Just Furs by the Debtor at the time it took the security interest in Just Furs' inventory.[12]

## B. Conversion

■ To prevail on her claim that the Bank converted the Debtor's interest in the inventory, the Trustee must prove four elements: (1) intentional unauthorized and wrongful assumption of control, dominion, or ownership over the Debtor's personal property by the Bank; (2) the Debtor's ownership of property; (3) the Debtor's absolute and unconditional right to immediate possession of the property; and (4) a demand for possession by the Debtor. *See Pavilon v. Kaferly*, 204 Ill.App.3d 235, 247, 149 Ill.Dec. 549, 556–57, 561 N.E.2d 1245, 1252–53 (1 Dist.1990).

■ Application of this four part test leads to the conclusion that the Bank is entitled to summary judgment on the conversion count as a matter of law. The Bank clearly did not wrongfully assert dominion and control over the seized goods, because there can be no wrongful assertion of dominion and control where property is voluntarily transferred to the defendant by the owner, even if such transfer was done by mistake. *See General Motors v. Douglass*, 206 Ill.App.3d 881, 891–92, 151 Ill.Dec. 822, 829, 565 N.E.2d 93, 100 (1 Dist.1990). The furs at issue here were transferred pursuant to a settlement agreement entered into voluntarily by the Debtor. The fact that the order lifting the stay, which

underlying § 2–326. Furthermore, to hold that actual knowledge is irrelevant would create absurd results. Under such a rule, a creditor of the consignee who knows the consignee's inventory was acquired by consignment could agree with the consignee not to tell the debtor's other creditors about the consignment, then take and record a lien and enforce it against the consignor's property under § 9–114 and § 2–326(3), since the consignee is not known by most of its creditors to be engaged in selling the goods of others. Clearly, the drafters of the Illinois Commercial Code could not have intended such a result.

Because there is a substantial dispute as to what the Bank knew when it took its security interest, this court cannot grant summary judgment for the Trustee on this issue.

12. The Bank also argues that it is entitled to summary judgment as to the priority of its lien as a result of this court's order modifying the automatic stay to allow the Bank to enforce its lien against Just Furs' inventory. The Bank's argument in this regard is without merit. The law is clear in this Circuit that an order modifying the § 362 automatic stay is not entitled to res judicata effect and does not bar subsequent litigation challenging the validity, priority, or extent of liens or asserting other claims against the alleged lien creditor. The Bankruptcy Code is clear that motions to lift the stay are to be handled expeditiously. *See* § 362(c). Therefore, motions to lift the stay should not be bogged down by peripheral litigation of claims against the lienhold. Instead, litigation regard-ing the validity, priority or extent of liens should be resolved in proceedings separate from the proceeding seeking to lift the stay. *See In re Vitreous Steel Products Company*, 911 F.2d 1223, 1232 (7th Cir.1990). Since the claims the Trustee asserts against the Bank could not have been determined in the context of the stay proceeding, the order lifting the stay cannot be res judicata as to those claims.

In addition, the Bank argues that summary judgment as to the priority of its lien is appropriate because the Trustee lacks standing to assert claims belonging to Just Furs. The Bank takes the position that the Trustee of the Debtor, as a creditor of Just Furs, cannot bring an action against another creditor of Just Furs to avoid or challenge the grant of a security interest to that creditor by Just Furs. The Bank's argument in this regard confuses the nature of the instant adversary proceeding. In this proceeding, the Debtor's Trustee takes the position that as a result of a consignment arrangement, the inventory in question belonged to the Debtor, not Just Furs, and that as a result of the operation of §§ 2–326 and 9–114 of the Illinois version of the Uniform Commercial Code, the Debtor's ownership furs. The Trustee does not challenge the validity of the Bank's lien against Just Furs' assets. She simply says that the inventory was property of the Debtor's estate, was not subject to the Bank's security interest, and, therefore, the proceeds produced by the sale of the inventory belong to the Debtor's estate. She clearly has standing to pursue this action. *See, e.g.,* §§ 323, 541, 542.

the Debtor agreed to as part of the settlement agreement, may have been entered in error is irrelevant; a transfer induced by mistake is not sufficient to meet the requirement of wrongful assertion of dominion and control. Thus, the court grants the Bank's motion for summary judgment as to Count I of the Trustee's complaint.

### C. Equitable subordination

■ For the Trustee to succeed on her claims that the Bank's conduct with respect to the inventory justifies the equitable subordination of the Bank's claim against the Debtor, she must prove three elements: (1) the Bank engaged in inequitable conduct; (2) that conduct resulted in injury to creditors of the Debtor or conferred an unfair advantage on the Bank; and (3) equitable subordination of the claim is consistent with the Bankruptcy Code. *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1351 n. 13 (7th Cir. 1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *In the Matter of Mobile Steel Corp.*, 563 F.2d 692, 699–700 (5th Cir.1988). *See also* § 510(c).

■ The caselaw dealing with equitable subordination of claims in bankruptcy draws a sharp distinction between equitable subordination of the creditor claims of insiders and equitable subordination of the claims of creditors who are not insiders. *Kham and Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1356 (7th Cir.1990). Thus, if the Trustee can show that the Bank was in a position where it exercised control over the Debtor such that it owed a fiduciary relationship to the Debtor and its creditors, and its conduct breached that relationship, the Bank's claim will be equitably subordinated. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). However, if the Bank was not an insider with respect to the Debtor, *see* § 101(31), its claim will only be equitably subordinated if the Bank was guilty of "gross misconduct" in its dealings with the Debtor.

*Kham and Nate's*, 908 F.2d at 1357; *In re Badger Freightways, Inc.*, 106 B.R. 971, 977 (Bankr.N.D.Ill.1989).[13]

■ There is no allegation here that the Bank is an insider. Instead, the Trustee argues that the Bank's claim should be equitably subordinated based on the Bank's alleged "gross misconduct." The Trustee argues that the Bank acted inequitably by seeking modification of the automatic stay to allow the Bank to proceed against the Just Furs inventory, despite the fact that the Bank knew and failed to inform the court that the Just Furs inventory was owned by the Debtor. Clearly, if the Bank or its attorneys sought modification of the stay without fully informing the court of all relevant facts within the Bank's knowledge with the intent to mislead the court, the Bank's actions would fit within the category of "gross misconduct." *Cf.* Illinois Rule of Professional Conduct 3.3. Clearly, such misconduct would give the Bank an unfair advantage at the expense of the Debtor's other creditors, enabling it to realize on property that it would not have been able to reach had the court been fully informed about the consignment. Finally, it would be consistent with the Code to equitably subordinate the Bank's claim in such a case to punish wrongdoing, to protect the integrity of the bankruptcy system, and to provide for the fair treatment of creditors.

■ The Trustee has produced no smoking pistol about the Bank's conduct during the stay litigation. Instead, what the Bank knew at the time it sought modification of the stay is a genuine issue of material fact. Thus, the court is unable to grant summary judgment for either party on the equitable subordination issue.

### II. *Transfers The Trustee Seeks To Avoid*

Counts IV–VI of the Trustee's complaint concern transfers by the Debtor to the Bank the Trustee seeks to avoid. In

---

**13.** *In re Virtual Network Services*, 902 F.2d 1246 (7th Cir.1990), which allowed the subordination of a penalty claim of the Internal Revenue Service despite the fact that the IRS was not guilty of any misconduct, is confined to liquidating Chapter 11 plans and has no application to this proceeding.

Counts IV and V, the Trustee seeks to avoid alleged preferential transfers. Count IV claims that thirty four payments totalling $622,188.65 made by the Debtor to the Bank in the year preceding the Chapter 11 petition on account of trade acceptances were preferential. Count V asserts that six payments totalling $116,517.88 made by the Debtor to the Bank in the year preceding the petition date on account of the Bank's commercial loans to the Debtor were preferential. In Count VI, the Trustee seeks to avoid as a fraudulent conveyance a $775 payment made by the Debtor to the Bank on a personal loan of Alper's wife.

### A. Preferences: trade acceptances and commercial loan payments

Section 547(b) requires a trustee to prove six elements to avoid a transfer as a preference. First, the transfer must have been of property of the debtor. Second, the transfer must have been made to or for the benefit of a creditor. Third, the transfer must have been made for or on account of an antecedent debt. Fourth, the transfer must have been made while the Debtor was insolvent. Fifth, the transfer must have been made within ninety days of the filing of the bankruptcy petition, unless the transfer was made to or for the benefit of an insider as that term is defined in § 101(31), in which case the 90 day period is extended to one year. Sixth, the transfer must have enabled a creditor to receive more than that creditor would have received if the transfer had not been made and the property had remained in the bankruptcy estate and was distributed in a Chapter 7 case for the debtor.

It is the burden of the trustee to prove all six elements of § 547(b) to have a transfer set aside as a preference. *See* § 547(g). This is true even with respect to insolvency. While § 547(f) does create a presumption that the debtor was insolvent during the ninety days preceding the petition, the presumption merely shifts the burden of going forward on the issue of insolvency to the preference defendant. The ultimate burden of proof on the insolvency

question remains with the trustee. *In re Taxman Clothing Co.,* 905 F.2d 166, 168 (7th Cir.1990).

If a trustee proves that a transfer is avoidable as a preference, the burden of proof shifts to the defendant to establish one of the affirmative defenses to preference recovery found in § 547(c). *See* § 547(g). If the defendant is unable to establish a § 547(c) defense, the trustee may recover the transfer as a preference from either any initial or mediate "transferee" or any creditor for whose benefit the transfer was made. § 550(a). *See generally Levit v. Ingersoll Rand Financial Corporation,* 874 F.2d 1186 (7th Cir.1989) (the *"Deprizio* doctrine"). A "transferee" is defined as something more than a possessor or holder or agent; rather, a transferee is, at a minimum, someone who exercises "dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir.1988).

### (1) Trade acceptances

As previously noted, the Debtor acquired its inventory through the use of trade acceptances, which are forms of payment closely analogous to a draft or a check. *See* n. 2 and accompanying text *supra.* As such, they are "instruments" as that term is used in the Uniform Commercial Code. Ill.Rev.Stat. § 9–105. The Debtor's payments to the Bank of the trade acceptances were clearly made for the benefit of the Debtor's trade vendors, for whom payment was ultimately intended. In addition, those payments benefitted another creditor of the Debtor, its owner and chief executive officer, Burton Alper. Alper was a co-obligor of the debts owed to the trade vendors and thus has a contingent claim against the Debtor because, should he be required to pay the trade acceptances personally due to the Debtor's failure to pay, he can look to the Debtor for reimbursement. *See* § 101(5). *See also Levit,* 874 F.2d at 1200–01.[14]

---

**14.** The Bank claims that Alper was not a co-

obligor of the debts owed to the trade vendors.

■ Furthermore, the payments were clearly made on account of antecedent debts, the trade debts owed to the vendors. In addition, because the payments on the trade debts benefitted Alper by reducing his personal exposure on the trade acceptances, the payments were for the benefit of an insider. *Levit*, 874 F.2d at 1200–01; *In re Ishaq*, 129 B.R. 206, 207 (Bankr.D.Or. 1991). Thus, the preference period is opened up to include all payments made within one year preceding the petition. *Levit*, 874 F.2d at 1200–01; § 547(b)(4)(A). Finally, the transfer enabled the vendors to receive more than the vendors would have received if the transferred property had remained in the bankruptcy estate and was distributed under Chapter 7. *See Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936).

However, there are two genuine issues of material fact with respect to the trade acceptance payments as preferential payments that preclude a grant of summary judgment for either party. First, the Bank has raised the issue of whether the Debtor was insolvent at the time of the transfer. The Bankruptcy Code uses a balance sheet approach to insolvency, i.e. fair value of assets less debts. *See* § 101(32). The Seventh Circuit has interpreted this approach to require this court to determine what a willing buyer would pay for the entire package of the debtor's assets and liabilities. If the result is positive, the debtor is solvent. If the price is negative, the debtor is insolvent. *Covey v. Commercial Bank of Peoria*, 960 F.2d 657, 660 (7th Cir.1992).

■ The court cannot determine from the record before it if, under the *Covey*

test, the Debtor was insolvent at the time of any or all of the trade acceptance payments. Obviously, the Trustee and the Bank disagree on this point, and both have presented expert evidence to support their positions. It would not be appropriate to resolve a "battle of the experts" without hearing the experts' live testimony. *See United States v. J.B. Williams*, 498 F.2d 414, 430 n. 19 (2d Cir.1974). Thus, summary judgment is inappropriate on the question of insolvency.

■ Second, the Bank claims it is not a "transferee" from whom the trade acceptance payments are properly recoverable, relying on the definition of "transferee" for these purposes enumerated by the Seventh Circuit in *Bonded Financial*. As previously noted, the *Bonded Financial* court defined a transferee as one which has exercised "dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Financial Services*, 838 F.2d at 893. The key issue, therefore, is whether the Bank in fact exercised dominion or control over the funds the Debtor transferred to it for payment of the trade acceptances.

It is the Trustee's claim that the Bank asserted "dominion" over the trade acceptance payments because it had the legal right to apply the funds to any debt the Debtor owed the Bank. The Bank says that it played no more than a caretaker or conduit role in collecting the trade acceptance payments from the Debtor and paying the trade vendors as instructed by the Debtor. Both parties have presented documentary evidence in support of their posi-

---

However, the evidence before the court in support of the Trustee's summary judgment motion makes it clear that Alper was indeed a creditor of the Debtor. It is undisputed that the trade acceptances were signed by Alper. Alper did not indicate that he was signing the trade acceptances in a representative capacity. Ill.Rev. Stat. § 3–402 provides that "unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement." Consequently, Alper is liable on the trade acceptances as an indorser under state law, and is thus a co-obligor. Although Alper claims (for obvious reasons) that he intended to sign in a representative capacity, parol evidence is inad-

missible to absolve an indorser of liability unless there is some evidence on the face of the indorsed instrument that the indorser signed in a representative capacity. *See Bar–Ram Irr. Products v. Phenix–Girard Bank*, 779 F.2d 1501, 1504 (11th Cir.1986); *Winkler v. Stoller*, 839 F.2d 1002, 1006 (3d Cir.1988). *See also Falcone v. Hinsdale Gynecology & Obstetrics, Ltd.*, 148 Ill.App.3d 439, 446, 102 Ill.Dec. 137, 142, 499 N.E.2d 694, 699 (1986), *appeal denied*, 114 Ill.2d 544, 108 Ill.Dec. 416, 508 N.E.2d 727 (1987) (person who signs instrument presumed to be personally liable and parol evidence is not admissible to overcome the presumption).

tions. The court needs to determine what the reality of the relationship was between the Bank and the Debtor with respect to the trade acceptance payments. This requires live testimony and credibility determinations.

Accordingly, summary judgment with respect to the trade acceptance payments is inappropriate.

### (2) Commercial loan payments

 The Debtor's commercial loan payments to the Bank were clearly made for the benefit of the Bank, a creditor to whom the payments were owed. In addition, those payments benefitted another creditor, Alper. Alper was a guarantor of all of the Debtor's indebtedness to the Bank and thus had a contingent claim against the Debtor. § 101(5). Any and all payments to the Bank on the commercial loans served to reduce Alper's exposure as a guarantor of those loans. *See Levit*, 874 F.2d at 1200–01. The payments were clearly made on account of antecedent debts, i.e. the loans owed to the Bank. Furthermore, the preference period with regard to the commercial loan payments is expanded from ninety days to one year because the payments benefitted Alper, an insider creditor.[15]

 Finally, the transfer enabled the Bank to receive more than it would have received if the transferred property had remained in the bankruptcy estate and was distributed under Chapter 7. The Bank argues that it has a right of setoff against the Debtor's deposit accounts which somehow makes it sufficiently secured, such that it did not receive more than it would have in a Chapter 7 liquidation. The Debtor did have deposit accounts with the Bank, with respect to which the Bank was entitled to a right of setoff. *See* § 553. Thus, the Bank had a secured claim to the extent of the balance in those deposit accounts. *See* § 506(a); *Matter of Day*, 747 F.2d 405, 406 (7th Cir. 1984). However, the balance in the deposit accounts was well below that of the debt owed to the Bank by the Debtor on the date of the bankruptcy petition.[16] *See In re Tenna Corp.*, 801 F.2d 819, 822–23 (6th Cir.1986) (relevant date for determining hypothetical liquidation result is date of petition). Consequently, the Bank is clearly an undersecured creditor.

**15.** The Bank asserts that the *Deprizio* doctrine, *see* Section II *supra*, should not apply to the commercial loan payments, because: (1) *Deprizio* should not be applied retroactively; and (2) Alper's guarantor liability claim is somehow "too contingent" to be allowed. Both assertions are fallacious. *Deprizio (Levit v. Ingersoll Rand Financial Corporation*, 874 F.2d 1186 (7th Cir. 1989)) is absolutely binding on this court. The court in *Deprizio* itself applied its decision retroactively to rule against a bank which had extended loans to the debtor in 1982, some seven years before the decision. Accordingly, it is clear that the decision applies to transactions entered into before the Seventh Circuit's ruling. The Bank's reliance on *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) is misplaced. In *Chevron Oil*, the Supreme Court held that three factors are to be considered in the determination of whether a decision should apply only prospectively: (a) whether the decision establishes a new principle of law by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (b) whether prospective application will serve the operation of the new principle of the law; and (c) whether, if retroactively applied, the decision would lead to inequitable results. Under the *Chevron* test, there is a strong presumption in favor of retroactive application. *E.E.O.C. v. Vucitech*, 842 F.2d 936, 941–42 (7th Cir.1988). This court finds that applying the *Deprizio* doctrine retroactively is appropriate under the *Chevron* test, since *Deprizio* represents one of two "plausible" explanations of an ambiguous statute. *See Vucitech*, 842 F.2d at 941.

As to the idea that Alper's guarantor liability claim is "too contingent," the definition of "claim" under the Bankruptcy Code does not turn on the degree of contingency. In fact, the drafters of the Code intended the definition of "creditors" to include any claim, regardless of how remote. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977). With respect to the typical guaranty, the contingency is the default of the primary obligor. In the present case, there is simply a further contingency—that being payment of the debt in full. *See* § 509(c). Alper still has a contingent claim against the Debtor, and thus is still a creditor of the Debtor. *See In re Helen Gallagher Enterprises*, 126 B.R. 997, 1000–01 (Bankr.C.D.Ill.1991). *See also* § 502(c).

**16.** Indeed, it is clear from the exhibits submitted by the parties in connection with these cross motions for summary judgment that this was the case at all relevant times.

Undersecured creditors have secured claims to the extent of the value of the debtor's property securing their claims and unsecured claims to the extent that their overall claim exceeds the value of their collateral. §§ 506(a), 506(d); *Dewsnup v. Timm*, — U.S. —, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Payments to an undersecured creditor are presumed to be applied against the unsecured portion of that creditor's debt. *Barash v. Public Finance Corp.*, 658 F.2d 504, 508 (7th Cir.1981). *See also Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C.Cir.1986) (same); *In re Gilbertson*, 90 B.R. 1006, 1010 (Bankr. D.N.D.1988); *but see* King, 5 Collier on Bankruptcy ¶ 547.08, at 547–43 (15th Ed. 1990) (suggesting that creditor could apply payment to secured part of claim by releasing a corresponding amount of collateral, but noting that there is "no recorded instance" of a partially secured creditor doing anything but taking the payment and retaining its collateral). Thus, absent a 100% distribution to unsecured creditors or a direct reduction of the secured portion of the undersecured creditor's claim, payments to an undersecured creditor should always enable that creditor to receive more than the creditor would have received in a Chapter 7 liquidation. In this case, it is quite apparent that the Debtor's unsecured creditors will not receive 100% of their claims. Thus, any payments on the commercial loans enabled the Bank to receive more than it would have been paid on such loans in a hypothetical Chapter 7 liquidation.[17] *See Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936).

Finally, the Bank, as the recipient of the payments, is a transferee from whom the payments made be recovered under § 550.

■ However, as previously noted, there is a genuine issue of material fact with respect to the Debtor's insolvency on the dates of the commercial loan payments. Moreover, there is a genuine issue of material fact with respect to whether and to what extent the Bank released deposits of the Debtor in response to receipt of the commercial loan payments. Thus, summary judgment as to the commercial loan payments is inappropriate at the present time.[18]

**B. Fraudulent conveyance: personal loan payments**

■ To establish that a transfer should be avoided as a fraudulent conveyance under § 548(a)(2)(B), the Trustee must meet three requirements. First, the transfer

---

**17.** The Bank argues that the commercial loan payments are excepted from avoidance under § 547(c)(4), since the Bank's release of deposits to the Debtor after the receipt of the commercial loan payments constitutes the giving of "new value." However, the Bank has not presented any evidence whether or to what extent it released deposits after receipt of the commercial loan payments. The burden lies with the Bank to establish any § 547(c) defense. *See* § 547(g).

§ 547(a)(2) defines "new value" as including "money or money's in ... release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law." Any release of deposits by the Bank fits within the definition of new value. Thus, the commercial loan payments would be excepted from avoidance by § 547(c)(4) to the extent the Bank can show at trial that it released deposits subsequent to receipt of the commercial loan payments, at least to the extent those deposits have not been replaced as of the date of the petition. *See In re Almarc Mfg.*, 62 B.R. 684, 686–87 (Bankr.N.D.Ill.1986).

**18.** The Bank claims that the commercial loan payments were made in the ordinary course of business. The Supreme Court has recently ruled that payments of long-term debt can be in the ordinary course for purposes of § 547(c)(2). *Union Bank v. Wolas*, — U.S. —, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). In this case, however, the only evidence presented to the court is that the payments were extraordinary. It appears that the payments do not at all conform to the parties' prior payment practices. The Trustee has established that, prior to 1988, the Debtor made regularly monthly payments on its long-term debt to the Bank. However, beginning in April 1988, the payments were made late, sporadically and in widely varying amounts. *See* Trustee's Exhibit 68. Moreover, there is clear and unrefuted evidence that the payments were a direct result of stepped-up enforcement efforts by the Bank. *See* Trustee's Exhibit 15 (Deposition of Kent Radovich, December 5, 1990, at 24–26). Thus, it is clear that the ordinary course of business exception does not apply. *See Matter of Xonics Imaging Inc.*, 837 F.2d 763 (7th Cir. 1988).

must have been within the year preceding the filing of the bankruptcy petition. Second, the debtor must have received less than reasonably equivalent value for the property transferred. Third, the debtor must have been insolvent on the date of the transfers. Insolvency is defined in the same manner as under § 547. *See* Section II A *supra*.

Here, the Debtor paid $775 to the Bank on Alper's wife's personal loan on April 28, 1988, within one year of the filing of the petition. It is axiomatic that a debtor receives less than reasonably equivalent value when paying loan obligations personally incurred by its principal. *See In re Truco, Inc.*, 110 B.R. 150, 153 (Bankr. M.D.Pa.1989). Thus, it is clear that to the extent the payment reduced Mrs. Alper's personal loan, the Debtor received less than reasonably equivalent value for the transfer. However, as previously indicated in this opinion, whether the Debtor was insolvent as of the date of the transfer is a genuine issue of material fact. *See* Section II A *supra*. Thus, summary judgment on the personal loan payments is not appropriate at this point.[19]

## CONCLUSION

For the reasons stated above, the court grants summary judgment for the Bank as to Count I of the Trustee's complaint, but denies summary judgment for either party on Counts II–VI. A Rule 16 pretrial conference in this proceeding is set for November 20, 1992 at 9:00 A.M.

---

**19.** The only count of the Trustee's complaint on which neither party sought summary judgment was Count VII, which asked the court to avoid the payment on Alper's wife's personal loan as a preference should the court refuse to avoid the payment as a fraudulent conveyance. Since the Trustee will succeed on her fraudulent convey- ance count if the Trustee is able to prove the Debtor's insolvency on the date of the personal loan payment, the preference action has become superfluous, as insolvency must also be proven on that count. Thus, the court does not expect that the Trustee will continue to press Count VII.