In re Alberto DUQUE RODRIGUEZ
and Domino Investments,
Ltd., Debtors.

John Paul MURPHY, Trustee, Plaintiff,

v.

Maria Alejandra VALENCIA, Avianca, Inc., Polly Lux De Hirsch Meyer, General Electric Credit of Tennessee, Southeast Bank, N.A., Capital Bank, Capital Bank, City National Bank, Southeast Bank, N.A., Defendants.

Bankruptcy No. 83–00903–BKC–TCB.

Adv. Nos. 87–0189–BKC–TCB–A, 87–0190–BKC–TCB–A, 87–0197–BKC–TCB–A, 87–0199–BKC–TCB–A, 87–0202–BKC–TCB–A, 87–0203–BKC–TCB–A, 87–0205–BKC–TCB–A, 87–0206–BKC–TCB–A, 87–0210–BKC–TCB–A.

United States Bankruptcy Court,
S.D. Florida.

June 26, 1987.

Blackwell Walker Fascell & Hoehl, Jeffrey B. Lathe, Miami, Fla., for Plaintiff.

Scott L. Baena, Stroock & Stroock & Lavan, Miami, Fla., for defendants.

## MEMORANDUM DECISION

THOMAS C. BRITTON, Chief Judge.

The chapter 7 trustee in the two bankruptcies noted above simultaneously filed 26 adversary complaints seeking recovery variously under 11 U.S.C. §§ 547, 548 and 550 of alleged preferential or fraudulent transfers. On the motion of several defendants, I directed that the issue of the debtors' insolvency, an element in every case, be tried separately on a single record in this particular adversary proceeding.

That trial was held June 11 with the express consent, I believe, of all affected defendants. As of this date, 9 of the 26 original adversary proceedings remain unresolved. This order, then, is applicable to the 9 proceedings and a copy will be docketed in each of the files listed above.

### The Principles Governing Evaluation

It is plaintiff's burden to prove the debtor's insolvency at the time of the challenged transfer, § 547(b)(3) and (g) and § 548(a)(2)(B)(i), or that the debtor "became insolvent as a result of such transfer or obligation." [1] As to transfers from the Duque estate, the relevant dates are between February 23 and May 19, 1983, all within 90 days before his bankruptcy. As to transfers from the estate of Domino Investments, Ltd., an entity owned and controlled by Duque, the relevant dates span

the entire year before the date of bankruptcy, May 19, 1983 in both cases.

Insolvency in this context is determined by the balance sheet test:

" 'insolvent' means ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors." § 101(31).

"Fair valuation" for our purposes here is indistinguishable from "fair market value." It is the:

"estimate of what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value, conceiving the latter as the amount which could be obtained for the property in question within such period by a 'capable and diligent business man' from an interested buyer 'who is willing to purchase under the ordinary selling conditions.' " 2 *Collier on Bankruptcy* ¶ 101.29[4] n. 60–63 (15th Ed.1987).

The Duque estate included 19 categories of assets ranging from furniture to a Miami bank, of which 12 were his interest in properties in Colombia, and 15 liabilities. The Domino estate was equally complex. The caselaw, particularly under the former Act, is not consistent with respect to the evidence appropriate to a determination of fair value, which suggests that the appropriate evidence depends in part upon a number of circumstances and considerable flexibility is essential, particularly where no jury is involved. The weight to be given particular evidence of course is materially affected by its character. *See In re Entertainment Incorporated,* 375 F.Supp. 390 (E.D.Va.1974).

### The Evidence

Plaintiff offered as an expert witness a CPA and MBA who had spent 1,500 hours over the past three years in reconstructing the financial condition of various entities

---

1. In 87–0189, plaintiff's count under § 548(a)(1), actual fraud, requires no proof of insolvency. In 87–0206 and 87–0210 insolvency is presumed as to certain counts under § 547(f) or § 553(c), but the presumption is rebuttable. Rule 301, Fed.R.Evid.

owned and controlled by Duque, four of which were brought into this court by Duque, including one transferred to the Middle District of Florida. He was assisted by his firm in reviewing all the available records. Most of this time was spent for other parties. The effort was handicapped by Duque's invocation of the Fifth Amendment (he is now serving a sentence for fraud) and by the general disarray of the records. The testimony of this witness was received under Fed.Evid.Rules 702, 703 and 704.

The witness found that on the relevant dates Duque was insolvent to the extent of *at least* $39,846,682 during February 1983, when his liabilities ($68,040,482) exceeded his assets ($28,193,800) by that sum. His insolvency increased in March, April and May to a final $78.5 million by the time he filed for bankruptcy.

Similarly, this witness found that Domino throughout the year before bankruptcy was insolvent to the extent of *at least* $11,197,000 during August 1982 and a maximum of $22.9 million in March 1983.

■ With the exception of the valuation of Duque's bank stock, defendants offered no expert to counter either the methodology or the findings of plaintiff's witness. They have, instead, attacked the witness' credibility because of the conservative position consistently taken by him in evaluating the assets and liabilities stated by Duque for himself and his four related entities before and when they filed for chapter 11 reorganization in May 1983. However, I believe the witness' skepticism is justified. The personal balance sheets were prepared when Duque was trying to borrow more money. The bankruptcy schedules were prepared when Duque hoped to win approval of a plan to reorganize his debt. On both occasions he had every reason to overstate his assets and understate his liabilities. Gross errors have since been documented in each respect and no documentation has been found in the intervening four years for a number of the assets he claimed. Duque's two closest lieutenants have confirmed the unreliability of Duque's valuations. Duque's balance sheets were unaudited and deserve the close scrutiny given by this witness.

Defendants have, more persuasively, challenged the witness' valuation of Duque's bank stock and his foreign investments, principally shares in Colombian corporations controlled by his Colombian relatives. These corporations owned Colombian real property.

### Duque's Bank Stock

■ Defendants' only witness, a local investment banker, expressed the opinion that Duque's bank stock was worth two times its book value or $41 million. Duque's bank stock was sold in January 1985 after a 19-month intensive effort by Duque and his creditors, which included a number of banks, for $21 million. Although the sale was conducted under the supervision of this court, it was deliberately conducted so as to realize the property's fair value. Neither defendants' witness nor their argument has suggested any circumstance that would negate the sale as the best evidence of fair market value. Nor has there been any contention that the value of the property decreased during the interval between the relevant dates and the sale. In fact, both the bank and the market for local bank stock were more attractive when the stock was sold. This sale price does not lose its evidentiary value merely because it occurred in the bankruptcy court. 2 *Collier on Bankruptcy* ¶ 101.29[4] n. 76 (15th Ed.1987).

The trustee, a retired banker with 27 years experience and recent local experience in the purchase of banks, estimated Duque's stock to be worth $30 million. Giving full credence to his generous estimate, Duque would still be insolvent by at least $30.8 million. I do not believe the accountant undervalued the bank stock, but if he did, the difference is not significant here.

Defendant's witness valued at $10 million Duque's option to buy additional bank stock. I am persuaded by the trustee's testimony, however, that the option which was at book value had only a nominal value if it had any at all.

### Duque's Foreign Investments

Plaintiff's accountant, who did not claim expertise as a real property appraiser and who never viewed the Colombian property, valued Duque's holdings in that country by using the values in the balance sheets filed with the Chamber of Commerce in that country, making certain adjustments that he has amply justified. There is no reason in this record for me to believe that the values in these documents were understated. The omission of some significant liabilities and the nature of the filing suggests that they were probably overstated.

■ Defendants have challenged these values by pointing to a telex and a memo from an agent of a creditor bank estimating the value of Duque's foreign holdings to be as much as $37 million. Plaintiffs have valued these assets at a minimum of $6.1 million. The opinion of the bank agent, whose qualifications are unknown, has never been exposed to cross examination. If the bank relied at all on this report, it surely rues the day for it is one of the major losers in this group of bankruptcies. The opinion of this agent is entitled to little if any weight.

■ Defendants have also pointed to my finding in January 1984 that Duque had failed to prove his insolvency in an action brought by him to avoid his personal guarantees of the debts of his business entities upon the ground that the guarantees were a fraud on Duque's creditors. On the basis of the record before me in that adversary proceeding and applying a negative inference against Duque from the quality of the evidence he offered, I rejected his claim of insolvency.

It is neither alleged nor argued here that the plaintiff trustee is bound by that finding. There is no basis, therefore, for me to consider either the evidence or the finding against the plaintiff trustee who was not a party to that action.

■ On this record, there is no basis to find plaintiff's valuation of Duque's foreign holdings to be significantly undervalued. Indeed, their location in Colombia and their complete control by persons beyond the reach of our courts make their value questionable for the purposes of the lawsuits before me.

### Valuation of Loan Guarantees

■ Defendants' have directed considerable criticism at the accountant's valuation as contingent liabilities of various loan guarantees. They offered no expert, however, to challenge the accountant's opinion. This is certainly an area in which reasonable judgments may differ, but I see no reason to second guess the accountant's assessments.

I shall not comment individually as to other assets or liabilities of Duque other than to say that I am not persuaded that the accountant's judgment has been shown to be unreasonable. In any event, the amounts involved are not critical for our purposes.

### Domino's Insolvency

Defendants' dispute with the accountant's assessment of Domino's condition is more muted but as unpersuasive as their challenge with respect to Duque's condition. What has already been said also reflects my view of the evidence with respect to Domino. I find the accountant's judgment reasonable and, once again, the amounts involved are not critical in this instance.

### Conclusion

I find that during the relevant times, both Duque and Domino Investments, Ltd., were insolvent.

To avoid unnecessary time and expense, I will delay the entry of any judgment with respect to the issues treated here until the entry of separate judgments in each affected adversary proceeding (including this one). Those judgments will not only incorporate the foregoing conclusion, but the remaining issues unique to each adversary proceeding. At that time, the parties are encouraged to consider the possibility of a stipulation for the joint review of the insolvency issues in the first appeal that raises them, if review is found necessary. This would be as helpful to the district court as

the parties' cooperation has been to this court.

 In view of the initiative taken by defendants' counsel in the presentation of this issue, which substantially reduced the costs of litigation for all parties, each party shall bear its own costs incurred in litigating insolvency notwithstanding the fact that I have resolved that issue in favor of the plaintiff.

