In re SCHWINN BICYCLE
CO., et al., Debtors.

SCHWINN PLAN COMMITTEE,
Plaintiff,

v.

AFS CYCLE & CO., LTD.,
et al., Defendants.

Bankruptcy Nos. 92 B 22474
to 92 B 22482.
Adv. No. 94 A 01618.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 8, 1996.

Howard Feller, Dion W. Hayes, McGuire Woods Battle & Boothe, Richmond, VA, Mark K. Thomas, Terry R. Horwitz Kass, Katten Muchin & Zavis, Chicago, IL, for Schwinn Plan Committee.

Debra Lee Allen, Transamerica Insurance Finance Corp., Towson, MD, Thomas R. Hill, Rooks Pitts & Poust, Chicago, IL, for Transamerica Insurance Finance.

John F. Donogher, Hodgson Russ Andrews, Woods and Goody, Buffalo, NY, for Shimano American.

Scott J. Goldstein, Spencer Fane Britt & Browne, Kansas City, MO, Michael J. Small, Goldberg Kohn Bell Black Rosenbloom & Moritz, Chicago, IL, for Betty Campbell.

Thomas E. Raleigh, Raleigh Helms & Finke, Chicago, IL, for Greenfield Industries Inc.

Scott L. Lanin, Farrell Fritz Caemmerer, Cleary, Barnosky and Armentano, Uniondale, NY, Michael P. O'Neil, Freeborn & Peters, Chicago, IL, for Li Hsin Rubber Ind. Co. Ltd.

Jill Ann Coleman, Neal Gerber & Eisenberg, Chicago, IL, for Regal International Development.

John K. Kneafsey, Daniel P. Dawson, Nisen & Elliott, Chicago, IL, for Ti Reynolds 531.

Steven M. Austermiller, Pederson & Houpt, Chicago, IL, for American Labelmark.

Craig Reimer, Christy S. Beznoski, Mayer Brown & Platt, Chicago, IL, for Citicorp Diners Club Inc.

Duane L. Coleman, Lewis Rice & Fingersh, St. Louis, MO, for True Fitness Technology Inc.

Norman B. Newman, Much Shelist Freed, Deneberg and Ament, P.C., Chicago, IL, for Nettles & Co. Inc.

John J. Stamos, Laurie S. Elkin, Frederick W. Acker, Stamos & Trucco, Chicago, IL, for Paioli Meccanica Spa.

John Carlson, Parker Chapin Flattau & Klimpl, New York City, for Orleander.

Eric C. Duncan, Gerald C. Condon Jr. & Assoc., Green Bay, WI, for Graber Products.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON BIFURCATED COMMON ISSUES

JACK B. SCHMETTERER, Bankruptcy Judge.

The Court ordered a limited bifurcation of the four entitled Adversary cases for trial on common factual issues. Those issues were set for trial, evidence was taken, the parties rested, and trial arguments were heard. The Court now makes and enters Findings of Fact and Conclusions of Law pursuant to Fed.R.Bankr.P. 7052.

### FINDINGS OF FACT

1. On October 7, 1992 (the "Petition Date"), Schwinn Bicycle Company and a number of its subsidiaries (collectively, the "Debtor" or "Schwinn") filed petitions for

relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code"). The subsidiaries of Schwinn Bicycle Company that filed for bankruptcy relief were Schwinn Sales West, Inc., Schwinn Sales Midwest, Inc., Schwinn Sales East, Inc., Paramount Design Group, Inc., Excelsior Fitness Equipment Co., Schwinn Bicycle Co. Limited, Frontline Technology, Incorporated, and Washington Manufacturing Company.

2. Previously in this bankruptcy case, substantially all of the Debtor's assets were sold to Zell Chilmark Fund, L.P. ("Zell") pursuant to section 363 of the Code for approximately $40.75 million. *January 19, 1993 Order and Judgment Pursuant to Section 363 of the Bankruptcy Code Authorizing Debtors to Transfer, Convey and Sell, Free and Clear of Liens, Claims and Encumbrances (i) Substantially All of the Debtors' Assets to Bicycle and Fitness Limited Partnership and (ii) The Debtors' Interest in the CBC Shares to CBC (the "Sale Order"), P.Ex. 13.*[1] The assets of the Debtor that were sold to Zell included cash, accounts receivable, inventory, machinery, equipment, furniture, vehicles, designs, product specifications, records, customer lists, intellectual property rights such as trademarks and trade names, leasehold interests, licenses and claims. *January 6, 1993 Asset Purchase Agreement between the Debtor and Zell/Chilmark Fund, L.P., P.Ex. 12.* As part of this sale transaction, the Debtor entered into an agreement with China Bike Company ("CBC") pursuant to which the Debtor's 18 percent interest in shares of CBC stock was transferred to CBC in exchange for a waiver by CBC of all claims against the Debtor in the approximate amount of $18.2 million plus a payment of $2.5 million by CBC to the Debtor. This Court approved the sale of the Debtor's assets to Zell in an Order dated January 6, 1993. *P.Ex. 13.* In the Sale Order, the Court found that the purchase price was fair and reasonable consideration, and was the highest offer made for the Debtor's assets and CBC stock. *P.Ex. 13.* The Order also stated that, "Confirmation of the sale will result in the maximization of the value of the Debtor's estate." *P.Ex. 13.*

3. Subsequent to sale of the Debtor's assets to Zell, the Debtor and the Unsecured Creditors' Committee filed a Joint Liquidating Plan. The Joint Liquidating Plan was subsequently amended twice, and in an Order dated June 6, 1994 (the "Confirmation Order"), this Court confirmed the Second Amended Joint Liquidating Plan (the "Plan"). *P.Ex. 15 and 16.*

4. Article IX of the Plan established the Committee to perform various tasks necessary for plan implementation. *P.Ex. 15.* Pursuant to § 9.2 of the Plan and ¶ 34 of the Confirmation Order, the Committee was authorized to prosecute any proceedings which could be brought on behalf of the Debtor or the Debtor's estate and to recover any transfers to which the Debtor might be entitled to under the Code. *P.Ex. 15.*

5. On October 3, 1994, the Committee filed four separate Adversary Complaints (of which the above-entitled is one) seeking to avoid and recover alleged preferential transfers under sections 547 and 550 of the Code from 348 defendants in these four adversary proceedings. It alleged in paragraphs 14 and 15 of each of its Complaints that Debtor was insolvent at the time of alleged preferential transfers and that the Defendants each received more through the alleged preferential transfers than they would have received in a Chapter 7 liquidation. A number of the Defendants denied that the Debtor was insolvent at the time of alleged preferential transfers as § 547(b)(3) requires, and also denied that they received more through the alleged preferential transfers than they would have received in a Chapter 7 liquidation, as § 547(b)(5) requires. *See* 11 U.S.C. § 547.

6. On May 18, 1995, it was ordered that there be a consolidated trial in all four adversary proceedings on the common issues addressed in paragraphs 14 and 15 of the Committee's Complaints.

7. The Committee's evidence regarding the Debtor's financial condition and its assets and liabilities during the 90–day statutory preference period before the Bankruptcy Pe-

---

1. Plaintiff Schwinn Plan Committee's Trial Exhibits are referred to herein as *"P.Ex. ____."*

tition filing date, and regarding the Debtor's hypothetical Chapter 7 liquidation, included expert testimony from Mr. Arnold H. Dratt, and the fact testimony from Messrs. Dratt, Gary E. Thorholm (Schwinn's Manager of Treasury), Donald Coglianese, Edward R. Schwinn, Jr. (Schwinn's President, Chairman and CEO), and Christopher T. Barney (Schwinn's Controller).

8. The evidence demonstrated that the Debtor was not financially viable, was in serious financial distress and was on its business deathbed when it filed for bankruptcy protection in October of 1992. The Debtor had suffered substantial losses and was experiencing a severe cash crisis by the summer of 1992. It could not then meet its obligations, especially obligations to its product suppliers. The Debtor was on the verge of having to close its doors when it filed in bankruptcy.

9. In May 1992, the accounting firm of KPMG Peat Marwick ("KPMG") conducted an audit and prepared consolidated financial statements for the Debtor for the year ending December 31, 1991. *P.Ex. 1.* In the consolidated financial statements, KPMG eliminated and reduced to zero all intercompany indebtedness and receivables, which Donald Coglianese, the KPMG partner who supervised KPMG's audit of the Debtor, testified is in accordance with generally accepted accounting principles. *P.Ex. 1.* In the financial statements, KPMG noted that the Debtor's sales declined from 1990 to 1991 and that the Debtor incurred net losses of $23,292,000 and $2,943,000 in the years 1991 and 1990, respectively. *P.Ex. 1.*

10. In its audit opinion letter which accompanied the consolidated financial statements, KPMG issued a going concern qualification in which it indicated that it had substantial concerns about whether the Debtor would be able to continue as a going concern. *P.Ex. 1.* According to Mr. Coglianese, an auditor's going concern qualification generally indicates that the auditor has determined that there is substantial doubt that the company will continue as a going concern in the next 12 months. The factors that caused KPMG to issue a going concern qualification for the Debtor as of the end of 1991 included large losses, decreasing sales, decreasing profit margins, liquidity concerns, negative working capital, virtually no shareholders' equity and the Debtor's violation of certain debt covenants with its secured lenders in 1992. According to Mr. Coglianese, in the event that the Debtor ceased to operate as a going concern, which Edward Schwinn testified would have happened in 1992 without the bankruptcy filing, liquidation accounting would have been the proper method of valuing the Debtor's assets and liabilities, rather than going concern valuation. Within five months after the going concern qualification was issued, the Debtor filed for bankruptcy.

11. The evidence demonstrated the reasons for Schwinn's bankruptcy filing. Schwinn lost $23 million in 1991, lost an additional $7.7 million during the first 9 months of 1992, and had a negative net worth of $7.1 million on its September 30, 1992 balance sheet. *P.Ex. 4.* In October 1992, Schwinn lost another $6.4 million and its negative net worth almost doubled to $13.5 million. During the first 9 months of 1992, Schwinn's sales and accounts receivable declined, its inventory levels decreased dramatically, it did not have an adequate supply of product and inventory, its major bicycle suppliers cut back on their shipments, the banks decreased the borrowing base and reduced the amount of financing available to Schwinn, and the banks were not willing to provide new financing to Schwinn. The testimony on these financial problems was corroborated by financial statements made part of Plaintiff's Exhibit 11. These financial statements showed that Schwinn's monthly net sales went from $18.8 million in January 1992 to only $9.1 million in August and $5.1 million in October 1992. This was at a company which had sales of $176 million in 1991, an average of $14.7 million per month. Schwinn's gross profit margin went from 21% in January 1992 to 13% in July, 4% in August and 5% in September. Its accounts receivable declined from $38.7 million in January 1992 to $23.8 million in August and $22.9 million in September, and its inventory decreased from $48.2 million in January to only $29.1 million in September. The banks reduced Schwinn's

revolving bank loan balance by approximately eighty percent (80%), from $38.1 million in January 1992 to $18.7 million in July, $14.7 million in August and only $8 million in September, which prevented Schwinn from being able to replenish its inventory. The financial statements also confirmed that Schwinn's trade accounts payable increased almost 3 times, which caused suppliers to reduce their shipments to Schwinn because they had not been paid for past due bills. All of this produced a deficit in every month from March 1992 forward. P.Ex. 4.

12. The evidence further showed that Schwinn's financial problems dated back to early 1991. The first month in which Schwinn suffered a loss was March 1991, according to Christopher Barney. After March 1991, Schwinn incurred a loss in every month in 1991 except June and August. *P.Ex. 4.* Schwinn's monthly losses progressively increased from $147,000 in March 1991 to $2.3 million in October 1991 to $9 million in December 1991. *P.Ex. 4.* A decline in sales was largely responsible for Schwinn's increasing losses in 1991. In 1991, Schwinn's monthly net sales decreased from $22.1 million in January 1991 to $9.4 million in December 1991. *P.Ex. 4.* According to Gary Thorholm, when he began to work at Schwinn in August 1991, Schwinn was behind on its accounts payable owed to vendors and was in the process of closing one of its distribution centers.

13. Mr. Thorholm, who was in charge of the Debtor's payables, testified regarding the Debtor's cash position and its relationship with its vendors from August 1991 through the bankruptcy filing. When Mr. Thorholm first began to work for the Debtor in August 1991, he discovered a desk drawer full of from $1.5 million to $2.5 million in checks prepared to pay vendors of the Debtor, but which had not been signed or mailed. The Debtor was holding those checks because the banks' periodic sweeps of its operating accounts were leaving the Debtor with insufficient cash to pay its vendors' invoices. This practice of holding checks continued until the Debtor's petition date. The dollar amount of written but unsigned and unmailed checks that the Debtor was holding at any given

moment during 1992 ranged from $1 million to $3 million, according to Mr. Thorholm. During the ninety days before the Debtor's bankruptcy filing, less than fifty percent of the Debtor's checks prepared for vendors were being signed and mailed. The banks were causing the Debtor to experience a "slow death" during the ninety days before bankruptcy, according to Mr. Thorholm, by monitoring the Debtor's borrowing base and sweeping cash from the Debtor's operating accounts, severely restricting the Debtor's ability to obtain product. The Debtor's borrowing base, which consisted of cash on hand and a percentage of accounts receivable and inventory, dropped from $67.8 million in January 1992 to $41.8 million in July 1992. *1992 Financials, P.Ex. 3.* As a result, during the ninety days before the Debtor's bankruptcy, the Debtor was unable to pay its payables as they came due in the ordinary course and was unable to obtain sufficient product.

14. Consistent with Gary Thorholm, Edward Schwinn, Christopher Barney and Arnold Dratt testified that Schwinn's financial condition and cash position were poor during the 90–day period before it filed for bankruptcy. It was not generating sufficient income to cover its obligations and was on the brink of shutting down when it filed for bankruptcy. Gary Thorholm and Edward Schwinn testified that the banks were sweeping cash from Schwinn's operating account on a weekly basis during the three months before the filing. In effect, the banks deprived Schwinn of the cash it needed to purchase inventory and support its operations. Christopher Barney explained that, by reducing the financing available to Schwinn and by sweeping its cash, the banks crippled the company during the 90–day period before the filing. By the time Schwinn filed for bankruptcy, it could not manage its debt and had no chance of surviving, was not viable, and could not be reorganized in any business sense.

15. Edward Schwinn, who was the Debtor's President, Chairman, and Chief Executive Officer for almost fifteen years before the Debtor's bankruptcy, further testified regarding Debtor's unsuccessful efforts to recapitalize before the bankruptcy filing. He

testified that, during the period from January 1992 to October 1992, the Debtor needed between $14 million and $24 million to resolve its financial difficulties. By the summer of 1992, vendors were reluctant to sell to the Debtor because their past-due invoices were not being paid. In November 1991, Debtor retained Continental Partners, a Chicago investment bank, to assist it in recapitalizing its business by obtaining new loans or new equity or through a sale of some or all of the Debtor's assets. Despite the efforts of Continental Partners, however, the Debtor was unable to recapitalize in 1992.

16. According to Mr. Schwinn, the Debtor also investigated in late 1991 and 1992 the possibility of raising capital by selling the Debtor's CBC stock, which was traded on the Shenzhen (China) Stock Exchange. The Debtor sought advice of its attorneys and Continental Partners on this issue, but concluded that it could not sell the CBC stock. Mr. Schwinn testified that certain restrictions on the sale of the stock were contained in CBC's corporate articles which prevented a market sale of the Debtor's stock both before and during the Debtor's bankruptcy. Furthermore, Mr. Schwinn received a letter dated August 28, 1992 from the Shenzhen Municipal Authority, which indicated that the Debtor's sale of the CBC stock would not receive the required government approval unless and until the Debtor first satisfied its approximately $18.2 million indebtedness to CBC. *P.Ex. 6.* The Debtor's banks also had a lien on its stock. Mr. Schwinn testified that the Debtor investigated ways of obtaining value from the CBC stock, including the possibility of exchanging it in satisfaction of Debtor's debt to CBC. However, prior to the bankruptcy filing, Debtor was unable to sell or even transfer the CBC stock.

17. In early October of 1992, Schwinn's banks refused to honor the company's checks. As Ed Schwinn testified, this was the last act which caused the Debtor to file for bankruptcy relief. If Schwinn had not filed for bankruptcy relief at that time, it would not have been able to continue operating. Schwinn would have gone out of business without the protection afforded by the bankruptcy filing.

18. Shortly after the bankruptcy petition was filed, The Dratt–Campbell Company, a turnaround consulting firm, was retained to assist Schwinn in the bankruptcy process. Within two weeks of the bankruptcy filing, Arnold Dratt concluded that Schwinn was not going to be able to survive and continue operating. He concluded that Schwinn could not be reorganized and would have to be sold, and he advised the owners of Schwinn of his conclusion several weeks after he was hired. Within a month after the filing, the Debtor and its creditors agreed with this conclusion and determined that Schwinn would have to be liquidated. Schwinn received just enough DIP financing to allow it to operate for a few months so that the value of the assets would be preserved and it could be sold. A bid process then was set up by December 1992 to sell Schwinn's assets.

19. The Committee's evidence therefore conclusively established that the Debtor was not financially viable, was on its deathbed and was in imminent danger of having to cease operations when it filed for bankruptcy.

20. Mr. Dratt performed an extensive review of values of the Debtor's assets and liabilities as of both June 30, 1992, and September 30, 1992. *P.Ex. 9(b).*[2] In determining the values of the Debtor's assets and liabilities based on an orderly liquidation, Mr. Dratt assumed a wind down of the Debtor's operations and a sale of the Debtor's assets over 60 to 90 days. *P.Ex. 9(b).* Mr. Dratt's final analysis and his assumptions were sound and reliable. As of June 30, 1992, which was shortly before the 90–day pre-bankruptcy preference period, the orderly liquidation value of the Debtor's assets was $75,738,000 and the value of its liabilities was $82,821,000, resulting in an insolvency in the amount of ($7,083,000).[3] *P.Ex. 9(b).* As of

2. 6A copy of P.Ex. 9(b) which was admitted into evidence at trial is attached hereto as **Exhibit A.** The final version of P.Ex. 9(b), which incorporates handwritten revisions that Mr. Dratt made at trial to P.Ex. 9(b), is attached hereto as **Exhibit B.**

3. Mr. Dratt's analysis properly values the Debtor's assets and liabilities on a consolidated basis.

September 30, 1992, based on an orderly liquidation analysis, the Debtor's assets were valued at $55,743,000 and its liabilities at $70,597,000, resulting in an insolvency in the amount of ($14,854,000). *P.Ex. 9(b)*. Since Schwinn lost more money and its financial condition got increasingly worse after June 30, 1992, its negative net worth was even higher as of July 7, 1992, and the amount of the insolvency continued to increase during the 90–day preference period.

21. Mr. Dratt also prepared an analysis of the value of the Debtor's approximately 18 percent interest in the CBC stock. *P.Ex. 9*. He properly valued that stock during the preference period at the value which was obtained for it when it was sold to CBC during the bankruptcy. During the preference period, despite its efforts to do so, the Debtor was unable to sell or liquidate the CBC stock. Subsequently, in connection with the sale of the company to Zell in January of 1993, the Debtor was able to transfer its CBC shares to CBC in exchange for a payment of $2.5 million and waiver of CBC's unsecured claim against the bankruptcy estate of approximately $18.2 million. Accordingly, the value of the Debtor's CBC stock during the ninety days before the Debtor's Petition Date was at most $8,324,-000, which represents the sum of the $2.5 million received from CBC plus the value of the waiver of CBC's $18.2 million claim. The latter is valued at 32 cents per dollar of the CBC claim which is the most that unsecured creditors are likely to receive by dividend herein. *P.Ex. 9(b)*.[4] The claim of $18.2 million times 32% equals $5,829,000.

22. Mr. Dratt also prepared an Analysis of the Debtor's Schedules pertaining to the bankruptcy schedules filed shortly after the Debtor's Petition Date. *P.Ex. 10*. The Debtor filed separate Schedules of Assets and Liabilities for each of the nine affiliated Schwinn debtors and listed on each Schedule intercompany receivables as assets and intercompany payables as liabilities. In analyzing the Debtor's Schedules, Mr. Dratt properly eliminated and reduced to zero all intercompany indebtedness and receivables. *P.Ex. 10*. Using the Debtor's own calculations after proper adjustment of intercompany indebtedness and consolidation, the Debtor was by this analysis insolvent as of the Petition Date in the amount of ($5,046,000). *P.Ex. 10*.

23. In valuing the Debtor's assets, Mr. Dratt did not give the Debtor's trademarks and trade names any separate values, but properly reasoned that the values of those assets were incorporated into the total value paid by Zell through purchase of Debtor's inventory and accounts receivable. *P.Ex. 9(b)*. Defendant McCaleb, Lucas & Brugman argued at trial that separate and additional values should be assigned to the Debtor's trademarks and trade names. Its argument fails, however, because the Debtor's intellectual property had no value separate from the Debtor's inventory and accounts receivable, and it was not offered for sale separate from the inventory and accounts receivable when Debtor's assets were marketed to prospective bidders during the bankruptcy. *December 1992 Bid Solicitation Package and Confidential Memorandum prepared by The Dratt–Campbell Company, P.Ex. 11*. The finished inventory was ultimately sold during the bankruptcy with the trade names on it. As Mr. Dratt testified, if that inventory had been sold without the trademarks and trade names, it would have been worth much less. A Schwinn brand bicycle had more market value than a no-name bicycle, even if they were otherwise identical. Additionally, most of the receivables were due from dealers who would be less likely to make payment to an owner of the receivables that did not also have the ability to make future shipments of Schwinn product. In any event, if a separate value is assigned to the Debtor's trademarks and trade names, then the value of the Debtor's inventory and accounts receivable would

---

The Debtor's bankruptcy estates were consolidated by Order of the Court dated December 22, 1993.

**4.** Mr. Dratt, who serves as the Vice President of SB Liquidating which, along with the Commit-

tee, is overseeing the liquidation of the Debtor's assets, testified that the total distribution to unsecured creditors in this case would likely not exceed 32 cents per dollar.

have to be reduced by an equal amount, so the total value of the Debtor's assets on the pertinent dates would remain the same.

24. Defendant McCaleb, Lucas & Brugman introduced evidence as to the book value of Debtor's assets during the ninety days before the Debtor's petition filing date, including the deposition testimony of Christopher Barney. Such evidence, while relevant to the issue of insolvency, carries small weight as to the actual market liquidation value of this Debtor's assets during the statutory preference period. The best evidence at to value of Schwinn's assets in this case is the value obtained for the assets when they were actually marketed and sold during the bankruptcy, shortly after the petition for relief was filed.

25. The foregoing establishes by a preponderance of evidence that the Debtor was experiencing a severe cash crisis throughout 1992; that it was prevented by its banks from purchasing necessary product or operating in the ordinary course of business; and that it was insolvent during the ninety days before it filing its bankruptcy petitions.

26. With regard to the issue of whether the preferential transfers enabled the defendants to receive more than they would have received in a Chapter 7 liquidation, the Court also finds in the Committee's favor. There have been two interim distributions to date in this case to general unsecured creditors totalling 28 cents per dollar of allowed claim. The total distribution to unsecured creditors is not expected to exceed 32 cents. Since the liquidation here was through a well-marketed, orderly sale that maximized Debtor's assets, a Chapter 7 liquidator certainly could not have produced a greater dividend. Accordingly, to the extent any creditor was paid more than 32% for any one or more invoices due, it clearly received more through the asserted preferential transfers than it would have received in a Chapter 7 liquidation.

27. No findings of fact are made with respect to the unique factual issues relating to § 547(b)(5) that Defendants Regal International Development Co., Ltd. and Transamerica Insurance Finance Corporation assert as to the Committee's preference claims against them. Like all Defendants in these Adversary Proceedings, however, those two Defendants are bound by these Findings of Fact to any extent it may later be found they would have had unsecured or undersecured claims against the Debtor had they not received the alleged preferential payments.

28. Further factual statements and findings contained in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

1. Under § 547 of the Bankruptcy Code, pre-bankruptcy preferential transfers of debtor's property or payments by debtor made while insolvent may be recovered. 11 U.S.C. § 547(b). To recover payment as a preference, it must be proved that it was (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while debtor was insolvent; (4) on or within 90 days before debtor filed its bankruptcy petition; and (5) enabled the creditor to receive more than it would have received had debtor not made the payment. 11 U.S.C. § 547(b); *In re Energy Co-op., Inc.*, 832 F.2d 997, 999–1000 (7th Cir.1987). All of these elements must be established to avoid a transfer. *Barash v. Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir.1981). Plaintiff has the burden of proving the first, second, fourth, and fifth elements of § 547(b) by a preponderance of the evidence. 11 U.S.C. § 547(g); *In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986).

As to the third element, insolvency, the debtor is presumed as a matter of law to be insolvent during the ninety days prior to the bankruptcy petition filing date. 11 U.S.C. § 547(f); *see also Barash*, 658 F.2d at 507. This presumption is not conclusive and may be rebutted by preference Defendants, but the burden of proof remains on the Plaintiff. *See Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 168 (7th Cir.1990); *Steege v. Affiliated Bank/North Shore National (In re Alper–Richman Furs, Ltd.)*, 147 B.R. 140, 153 (Bankr.N.D.Ill.1992); *Miller v. Kane (In re Del Grosso)*, 1992 WL 280788, *4 (Bankr. N.D.Ill.1992).

If the creditors rebut the presumption of insolvency (which they arguably did

here by introduction of Debtor's bankruptcy schedules), then the Plaintiff bears the burden of establishing Debtor's insolvency at the time of the purportedly preferential transfer by a preponderance of the evidence. 11 U.S.C. § 547(g); *see* 11 U.S.C. § 101(32); *see also In re Taxman Clothing Co.*, 905 F.2d 166, 168 (7th Cir.1990). As discussed below, the Plaintiff clearly met its burden in that regard.

■ 2. Section 101(32) of the Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at fair valuation...." 11 U.S.C. § 101(32). In other words, the Bankruptcy Code uses a "balance sheet" test for the purpose of establishing insolvency in a preference action under § 547. *See Matter of Taxman Clothing Co., Inc.*, 905 F.2d at 169–170; *Carmel v. River Bank America (In re FBN Food Services, Inc.)*, 175 B.R. 671, 690 (Bankr.N.D.Ill. 1994), *aff'd, In re FBN Food Services, Inc.*, 185 B.R. 265 (N.D.Ill.1995); *Steege v. Affiliated Bank/North Shore National (In re Alper–Richman Furs, Ltd.)*, 147 B.R. at 154; *Miller v. Kane (In re Del Grosso)*, 1992 WL 280788, *4.

■ 3. In applying the balance sheet test, the focus is on valuation of the debtor's assets. As a result, it is first necessary to determine the proper valuation standard that is to be applied. *See Neuger v. Casgar (In re Randall Construction)*, 20 B.R. 179, 183 (N.D.Ohio 1981).

■ 4. "Fair valuation" for purposes of § 101(32) is generally defined as the going concern or fair market price "[u]nless a business is on its deathbed." *Utility Stationery Stores, Inc. v. Southworth Company (In re Utility Stationery Stores, Inc.)*, 12 B.R. 170, 176 (Bankr.N.D.Ill.1981). When a business is in a precarious financial condition or on its financial deathbed, a liquidation value should be used to value the assets. *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 170 (7th Cir.1990); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341 (E.D.Pa.1988); *Neuger v. Casgar (In re Randall Construction)*, 20 B.R. at 183–84.

5. The rationale for using liquidation value in certain cases was explained by the court in *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd., Inc.)*, 93 B.R. 333, where the Chapter 11 trustee brought an action to avoid allegedly preferential transfers. The bankruptcy judge ruled that the debtor was insolvent on the date of the alleged preference payments. *Id.* at 340. That ruling relied on testimony of an expert who had used a liquidation analysis to value the debtor's inventory, receivables and physical assets. *Id.* at 341. On appeal to the district court, defendants argued that the court below had impermissibly relied on this expert testimony because it did not value the debtor as a going concern. The district court opinion pointed out that

... [i]f a company is "on its deathbed" or is nominally in existence, however, application of the going concern value is not appropriate ... To treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition.

*Id.; accord, Gillman v. Scientific Research Products Inc. of Delaware (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir. 1995) ("well-settled" that if a company is only nominally in existence, use of liquidation value rather than going concern value is appropriate); *Miller & Rhoads, Inc. Secured Creditors' Trust v. Airways Industries, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. 950, 955 (Bankr.E.D.Va.1992) (when the debtor is on its "deathbed," assets should be valued on a liquidation basis rather than on a going concern basis).

6. The United States Court of Appeals for the Seventh Circuit adopted this rule in *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, where it stated that "going concern value is not the proper standard if the business is 'on its deathbed.'" *Id.* at 170. As *Taxman* explained, a balance sheet schedule of assets and liabilities does not always yield an accurate picture of a firm's condition because "[a] firm could be solvent in balance-sheet terms yet be in danger of imminent failure." *Id.* at 169–170.

■ 7. In this case, the value of the Debtor's assets should not be measured by their going concern value. Rather, like the decision in *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd., Inc.), supra*, the evidence shows that the liquidation value method is the proper valuation standard for the purpose of this case because the Debtor was not financially viable, was in severe financial distress and was on its "deathbed" when it filed for bankruptcy and during the prior ninety days.

■ 8. The Schedules of Assets and Liabilities filed by Schwinn Bicycle Company, the parent corporation of the other Debtors, showed an excess of assets over liabilities. However, Debtor's schedules are not persuasive, let alone dispositive or controlling. For analysis of possible insolvency, reliance should be on more accurate evidence, such as current appraisals, opinion valuation testimony, or actual sales of the assets. *See Miller & Rhoads, Inc. Secured Creditors' Trust v. Airways Industries, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. at 956; *Pembroke Development Corp. v. A.P.L. Window (In re Pembroke Development Corp.)*, 122 B.R. 610, 612 (Bankr.S.D.Fla. 1991); *Neuger v. Casgar (In re Randall Construction, Inc.)*, 20 B.R. at 184. The Seventh Circuit in *Taxman* has noted the great potential for inaccuracy in relying solely on a schedule of assets and liabilities in assessing insolvency. *Matter of Taxman Clothing Co., Inc.*, 905 F.2d at 169–170.

9. It is certainly clear that asset values contained in the debtor's schedules are not determinative where the preference plaintiff can show errors in those schedules. *Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Company)*, 143 B.R. 468, 479 (Bankr.E.D.Tenn.1992); *Murphy v. Valencia (In re Duque Rodriguez)*, 75 B.R. 829, 832 (Bankr.S.D.Fla.1987). Indeed, courts have allowed debtors themselves to introduce evidence to show that their own original schedules filed with the court were incorrect. One court explained that

... asset valuations in bankruptcy schedules are often exaggerated and are based on cost, book value less depreciation and other academic or artificial criteria that

have little relation to sale or market value. It is clearly the law that such representations of debtors ... are not res judicata either as to creditors or the bankrupt, but are ex parte statements binding only on the bankrupt if they are not discredited or amended.

*Bigler v. American Mutual Liability Insurance Company (In the Matter of Bollinger Corp.)*, 11 C.B.C. 563, 565 (Bankr.W.D.Pa. 1976) (*citing Horner v. Hamner*, 249 F. 134 (4th Cir.1918)); *Miller & Rhoads, Secured Creditors' Trust v. Airways Industries, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. at 956 ("current appraisals of a debtor's assets afford a more accurate determination of a debtor's solvency that can be had solely by reference to a balance sheet") (*quoting Pembroke Development Corp. v. A.P.L. Window (In re Pembroke Development Corp.)*), 122 B.R. at 612.

10. Similarly, in *Knapp v. Applewhite (In re Knapp)*, 119 B.R. 285, 288 (Bankr. M.D.Fla.1990), the court held that

[i]n determining the issue of "insolvency" in preference actions, the Court may ignore pre- or even post-petition valuations of assets that are overly optimistic or unrealistic. Accordingly, courts have refused to adopt "solvent" figures from debtors' schedules, when those schedules were determined to be an "overly optimistic" appraisal of the debtors' assets in an effort to secure financing. (citation omitted).

11. In *W.L. Mead, Inc. v. Central States Pension Fund (In re W.L. Mead, Inc.)*, 70 B.R. 651, 655 (Bankr.N.D.Ohio 1986), the court held that the presumption of insolvency in § 547(f) is not rebutted by evidence of asset values listed in the debtor's bankruptcy schedules. The court held that

[w]hile it is recognized that the statements made in a Debtor's schedule can constitute evidence which may be used in subsequent proceedings, the magnitude of the discrepancy between the scheduled values and the actual sales prices strongly suggests that any inference which could be drawn from the schedules is not worthy of serious consideration.

*Id.; accord, Carlson v. Rose (In re Rose)*, 86 B.R. 193, 195 (Bankr.W.D.Mo.1988) (overstatement of value of assets in bankruptcy schedules is not sufficient to rebut presumption of insolvency); *Howdeshell of Ft. Myers v. Dunham–Bush, Inc. (In re Howdeshell of Ft. Myers)*, 55 B.R. 470, 473 (Bankr.M.D.Fla. 1985) (court is not required to accept erroneous valuation in schedules); *Friedman v. Ginsburg (In re David Jones Builder, Inc.)*, 129 B.R. 682, 692 (Bankr.S.D.Fla.1991) (court may ignore valuations of debtor's assets that are overly optimistic or unrealistic); *Miller & Rhoads, Inc. Secured Creditors' Trust v. Airways Industries, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. at 956 (courts should rely on evidence more accurate than debtor's schedules such as current appraisals, opinion testimony or actual sales of assets when determining insolvency).

12. Schwinn's Schedules of Assets and Liabilities, while relevant to the issue of insolvency, contain several inaccuracies and are not a reliable source for determining the actual values of Schwinn's assets. In the Schedules, Schwinn listed intercompany receivables as assets and intercompany payables as liabilities, which Mr. Dratt properly eliminated in his Analysis of the Schedules. *P.Ex. 10.* Additionally, Mr. Dratt properly consolidated the Schedules of the nine affiliated Schwinn debtors because the bankruptcy estates of the debtors were previously consolidated by Order of this Court. *P.Ex. 10.* Furthermore, Schwinn's Schedules contain unrealistic book values for Schwinn's assets. The proper values to be assigned to Schwinn's assets are not the book values given to those assets by Schwinn in its Schedules shortly after it filed for bankruptcy but rather the values which were actually obtained in the sale of those assets postpetition.

13. Several courts in this district have disregarded asset valuations which contain inaccuracies. For example, in *Bowers–Siemon Chemicals Company v. H.L. Blachford, Ltd. (In re Bowers–Siemon Chemicals Company)*, 139 B.R. 436 (Bankr.N.D.Ill.1992), Judge Sonderby disregarded a balance sheet which purported to evidence the debtor's solvency when she found that the balance sheet failed to report a long term liability of $650,-

000. *Id.* at 449. As a result of this error in the balance sheet, the court concluded that the preference defendants failed to rebut the presumption of insolvency granted by 11 U.S.C. § 547(f). *Accord, Courtney v. Octopi, Inc. (In re Colonial Discount Corporation)*, 807 F.2d 594, 598 (7th Cir.1986) (trustee's affidavit as to debtor's financial condition established insolvency and was not rebutted by two sets of balance sheets which purported to show debtor was solvent); *T.M. Sweeney & Sons, LTL Services, Inc. v. Crawford (In re T.M. Sweeney & Sons, LTL Services, Inc.)*, 120 B.R. 101, 103 (Bankr.N.D.Ill.1990) (testimony by debtor's president revealed that deductions needed to be taken from overstated asset valuations appearing on balance sheets).

14. Additionally, courts should take into consideration the feasibility of selling an asset when determining the appropriate value of that asset. In *Energy Cooperative Inc. v. Cities Service Company (In re Energy Cooperative, Inc.)*, 109 B.R. 822, 824 (N.D.Ill. 1989), the debtor had valued a refinery asset on its balance sheets at $161 million. *Id.* at 824. The district court, however, valued the refinery at $0 for purposes of an insolvency analysis because the overwhelming evidence showed the refinery simply could not be sold. *Id.* at 830. The court adopted the value the asset actually brought in the open market, not its balance sheet value, because, "[i]n the last analysis, all sophisticated valuations must yield to the realities of the marketplace." *Id.; Accord, Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 505 (N.D.Ill.1988) (debtor insolvent where "fair saleable value of its assets was exceeded by its liabilities when the illiquidity of those assets is taken into account").

15. Likewise, in *Knopfler v. Schraiber (In re Schraiber)*, 1992 WL 280801, *16 (Bkrtcy. N.D.Ill.1992), this Court, for purposes of determining insolvency, discounted the asserted value of the debtor's shopping mall "to account for all contingencies that must occur for the property to be sold." *Id., citing In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988) (in valuing a contingent asset for insolvency determination purposes, asset

must be reduced to its present, expected value); *accord, Murphy v. Valencia (In re Duque Rodriguez),* 75 B.R. at 832 (actual sale price of property is best evidence of asset value for insolvency analysis).

■ 16. A Seventh Circuit panel examined the issues of realistic valuations in *Covey v. Commercial National Bank of Peoria,* 960 F.2d 657 (7th Cir.1992). In that case, the Seventh Circuit interpreted the insolvency issue in a fraudulent conveyance context and stated that, where possible, a determination of what a willing buyer would pay for the entire package of the debtor's assets and liabilities is the best evidence of value. *Id.* at 660. "Market value of both assets and liabilities determines solvency." *Id.*

■ 17. Based on evidence described herein and for the reasons stated, it is found and concluded that the Debtor was insolvent during the preference period (at the time of the bankruptcy filing and for ninety days before then) and that the valuation of assets and liabilities set forth in Mr. Arnold Dratt's Liquidation Analysis is correct. *P.Ex. 9(b).* The proper value to assign to Debtor's assets during the ninety days before bankruptcy is the value that was actually received for those assets about three months after the bankruptcy filing. The total consideration received in the sale of substantially all of the Debtor's assets was approximately $40.75 million, and the assets which were not sold to Zell were sold subsequently with approval of this Court. Mr. Dratt in his Analysis properly assigned to those various assets the values which were ultimately obtained for them, which is the most accurate method of valuing Schwinn's assets.

■ 18. With regard to the § 547(b)(5) issue, the Court also finds and concludes that all defendants which have and had unsecured claims did, in fact, receive more through the preferential transfers than they would have received if this bankruptcy case was a Chapter 7 liquidation.

19. These Findings and Conclusions are entered in each of the four Adversary Proceedings Nos. 94 A 01618—94 A 01621. These rulings are presently interlocutory. Further individual trials on remaining issues as to each defendant will be scheduled and held, following which appropriate final judgments will be entered.

EXHIBIT
A

Prepared by The Dratt-Campbell Company

## Schwinn Bicycle Company
## Orderly Liquidation Analysis
### (000)

| | June 30, 1992 Book Value (1) | June 30, 1992 Orderly Liquidation (2) | September 30, 1992 Book Value (1) | September 30, 1992 Orderly Liquidation (2) |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | ($657) | $0 | $2,955 | $2,955 |
| Trade Accounts Receivable | $32,641 | $27,745 (3) | $21,026 | $17,872 (3) |
| Other Receivables | $2,207 | $0 | $1,890 | $0 |
| Inventory | | | | |
| Raw Material/Work In Process | $531 | $159 (4) | $416 | $125 (4) |
| Finished Bicycles/Exercisers | $26,373 | $29,010 (4) | $16,763 | $18,439 (4) |
| Parts/ Accessories/Rubber | $12,816 | $10,946 (4) | $10,885 | $9,015 (4) |
| Foreign | $3,830 | $2,298 (4) | $3,001 | $1,801 (4) |
| Reserve | ($1,752) | $0 | ($1,878) | $0 |
| Total Inventory | $41,798 | $42,414 | $29,187 | $29,380 |
| Prepaid & Other Current | $1,518 | $1,466 (5) | $1,195 | $1,466 (5) |
| Net Property & Equipment | $1,141 | $571 (6) | $1,054 | $527 (6) |
| Other Assets | $6,792 | ~~$9,357~~ (7) 3543 | $10,937 | ~~$9,357~~ (7) 3543 |
| **TOTAL ASSETS** | **$85,440** | ~~$81,562~~ 75,738 | **$68,244** | ~~$81,507~~ 55,743 |
| **LIABILITIES** | | | | |
| **Balance Sheet Liabilities** | | | | |
| Current Liabilities | | | | |
| Notes Payable To Bank | $23,884 | | $8,001 | |
| Accounts Payable | $32,865 | 28,865 | ~~$37,128~~ | 33,000 |
| Accrued Expenses | $3,612 | | $3,477 | |
| Total Current Liabilities | $60,361 | 56,361 | $48,606 | 44,478 |
| Long Term Liabilities | | | | |
| Bank | $21,460 | | $21,119 | |
| Unfunded Pension | $5,803 | — 0 — | ~~$5,700~~ | |
| | $27,263 | 21,460 | $26,819 | 26,119 |
| **Subtotal Balance Sheet Liabilities** | $87,624 | ~~$87,624~~ 77,821 | $75,425 | ~~$75,425~~ 65,597 |
| **Other Liabilities** | | | | |
| Administrative Expenses | - | $2,000 (8) | - | $2,000 (8) |
| Legal & Accounting | - | $3,000 (9) | - | $3,000 (9) |
| Pension Benefit Guaranty Corporation | - | ~~$2,697~~ | - | ~~$2,800~~ |
| **Subtotal Other Liabilities** | | ~~$7,697~~ 5,000 | | ~~$7,800~~ 5,000 |
| **TOTAL LIABILITIES** | **$87,624** | ~~$95,321~~ 82,821 | **$75,425** | ~~$83,225~~ 70,597 |
| **Net Worth / (Shortfall)** | **($2,184)** | ~~($13,759)~~ <7,083> | **($7,181)** | ~~($21,658)~~ <14,854> |

## LIQUIDATION ANALYSIS ASSUMPTIONS

(1) Company's consolidated balance sheet.

(2) Orderly liquidation assumes a winddown of operations and sale of assets over 60 to 90 days.

(3) Accounts receivable orderly liquidation value:

| | 6/30/92 | 9/30/92 |
|---|---|---|
| Gross Accounts Receivable | $32,641 | $21,026 |
| Less: Ineligibles @ 10% | $    0 | $    0 |
| | | |
| Eligible Receivables | $32,641 | $21,026 |
| | X 85% | X 85% |
| | | |
| | $27,745 | 17,872 |

(4) Inventory orderly liquidation value:

| | 6/30/92 | | 9/30/92 | |
|---|---|---|---|---|
| | Book | Liquidation | Book | Liquidation |
| Raw Material/WIP @ 30% | $   531 | $   159 (a) | $   416 | $   125 (a) |
| Finished Goods @ 110% | $26,373 | $29,010 (b) | $16,763 | $18,439 (b) |
| Parts/accessories/Rubber | $12,816 | $10,946 (c) | $10,885 | $ 9,015 (c) |
| Foreign @ 60% | $ 3,830 | $ 2,298 (d) | $ 3,001 | $ 1,801 (d) |
| | | | | |
| Total Inventory | $43,550 | $42,414 | $31,065 | $29,380 |

(a) Primarily from the Paramount line in Waterford, WI.
(b) Valuation is less than half normal 26% mark-up and is supported by strong order backlogs, lower than normal inventory, and a good mix of current models.
(c) $5.5MM core of slow moving SKU's estimated @ 66% of book value, with balance valued at 100% of book.
(d) Primarily finished goods in Europe discounted due to smaller dealer network.

(5) ITT refund only significant recovery.

(6) Property and equipment orderly liquidation value:

| | 6/30/92 | | 9/30/92 | |
|---|---|---|---|---|
| | Book | Liquidation | Book | Liquidation |
| Net property & equipment @ 50% | $ 1,141 | $   571 | $ 1,054 | $   527 |

(7) Other assets orderly liquidation value:

| | Book | Liquidation |
|---|---|---|
| China Bicycle Company | | $ 8,324 (a) |
| Hungary/CSEPEL | | $   319 (b) |
| CSV Life Insurance | | $   297 |
| Tulsa Land | | $   204 (b) |
| Paramount | | $   161 (b) |
| CCI/CCJ | | $    62 (b) |
| Trademarks & Tradenames | | $     0 (c) |
| | | |
| Total Other Assets | $ 6,792 | $ 9,367 |

(a) CBC claim of $18.2MM multiplied by 32% representing value of forgiveness of CBC's accounts payable claim of $18.2 million plus $2.5 million in cash.
(b) Actual values realized in an orderly liquidation.

(c) The relatively high liquidation values attributed to Schwinn's hard assets (inventory and accounts receivable) assumes that the tradenames are not sold separately. If some value was realized for the tradenames by selling them independently, hard asset liquidation values would need to be reduced significantly due to the impact on the dealer network and brand name.

(8) Includes all operational and administrative personnel necessary to make final shipments, close offices and warehouses, and prepare and collect receivables.

(9) Based upon combined expenses of company, secured, and unsecured counsel; consultants to the company and its creditors; and accountants and actuarials necessary to close the company's books.

Prepared by The Dratt-Campbell Company

EXHIBIT B

Schwinn Bicycle Company
Orderly Liquidation Analysis
(000)

| | June 30, 1992 | | | September 30, 1992 | | |
|---|---|---|---|---|---|---|
| | Book Value (1) | Orderly Liquidation | A Better Way (2) | Book Value (1) | Orderly Liquidation | A Better Way (2) |
| **ASSETS** | | | | | | |
| Cash | ($657) | $0 | $0 | $2,955 | $2,955 | $2,955 |
| Trade Accounts Receivable | $32,641 | $27,745 | $27,745 (3) | $21,026 | $17,872 | $17,872 (3) |
| Other Receivables | $2,207 | $0 | $0 | $1,890 | $0 | $0 |
| Inventory | | | $0 | | | |
| Raw Material/Work In Process | $531 | $159 | $159 (4) | $416 | $125 | $125 (4) |
| Finished Bicycles/Exercisers | $26,373 | $29,010 | $29,010 (4) | $16,763 | $18,439 | $18,439 (4) |
| Parts/ Accessories/Rubber | $12,816 | $10,946 | $10,946 (4) | $10,885 | $9,015 | $9,015 (4) |
| Foreign | $3,830 | $2,298 | $2,298 (4) | $3,001 | $1,801 | $1,801 (4) |
| Reserve | ($1,752) | $0 | $0 | ($1,878) | $0 | $0 |
| Total Inventory | $41,798 | $42,414 | $42,414 | $29,187 | $29,380 | $29,380 |
| | | | $0 | | | |
| Prepaid & Other Current | $1,518 | $1,466 | $1,466 (5) | $1,195 | $1,466 | $1,466 (5) |
| Net Property & Equipment | $1,141 | $571 | $571 (6) | $1,054 | $527 | $527 (6) |
| Other Assets | $6,792 | $9,367 | $3,543 (7) | $10,937 | $9,367 | $3,543 (7) |
| **TOTAL ASSETS** | $85,440 | $81,562 | $75,738 | $68,244 | $61,567 | $55,743 |
| **LIABILITIES** | | | | | | |
| **Balance Sheet Liabilities** | | | | | | |
| Current Liabilities | | | | | | |
| Notes Payable To Bank | $23,884 | | $23,884 | $8,001 | | $8,001 |
| Accounts Payable | $32,865 | | $28,865 | $37,128 | | $33,000 |
| Accrued Expenses | $3,612 | | $3,612 | $3,477 | | $3,477 |
| Total Current Liabilities | $60,361 | | $56,361 | $48,606 | | $44,478 |
| Long Term Liabilities | | | | | | |
| Bank | $21,460 | | $21,460 | $21,119 | | $21,119 |
| Unfunded Pension | $5,803 | | | $5,700 | | |
| | $27,263 | | $21,460 | $26,819 | | $21,119 |
| Subtotal Balance Sheet Liabilities | $87,624 | $87,624 | $77,821 | $75,425 | $75,425 | $65,597 |
| **Other Liabilities** | | | | | | |
| Administrative Expenses | | $2,000 | $2,000 (8) | - | $2,000 | $2,000 (8) |
| Legal & Accounting | | $3,000 | $3,000 (9) | - | $3,000 | $3,000 (9) |
| Pension Benefit Guaranty Corporation | - | $2,697 | | - | $2,800 | |
| Subtotal Other Liabilities | | $7,697 | $5,000 | | $7,800 | $5,000 |
| **TOTAL LIABILITIES** | $87,624 | $95,321 | $82,821 | $75,425 | $83,225 | $70,597 |
| **Net Worth / (Shortfall)** | ($2,184) | ($13,759) | ($7,083) | ($7,181) | ($21,658) | ($14,854) |

## LIQUIDATION ANALYSIS ASSUMPTIONS

(1) Company's consolidated balance sheet.

(2) Orderly liquidation assumes a winddown of operations and sale of assets over 60 to 90 days.

(3) Accounts receivable orderly liquidation value:

|  | 6/30/92 | 9/30/92 |
|---|---|---|
| Gross Accounts Receivable | $32,641 | $21,026 |
| Less: Ineligibles @ 10% | $ 0 | $ 0 |
| Eligible Receivables | $32,641 | $21,026 |
|  | X 85% | X 85% |
|  | $27,745 | 17,872 |

(4) Inventory orderly liquidation value:

|  | 6/30/92 Book | 6/30/92 Liquidation | | 9/30/92 Book | 9/30/92 Liquidation |
|---|---|---|---|---|---|
| Raw Material/WIP @ 30% | $ 531 | $ 159 | (a) | $ 416 | $ 125 |
| Finished Goods @ 110% | $26,373 | $29,010 | (b) | $16,763 | $18,439 |
| Parts/accessories/Rubber | $12,816 | $10,946 | (c) | $10,885 | $ 9,015 |
| Foreign @ 60% | $ 3,830 | $ 2,298 | (d) | $ 3,001 | $ 1,801 |
| Total Inventory | $43,550 | $42,414 | | $31,065 | $29,380 |

(a) Primarily from the Paramount line in Waterford, WI.
(b) Valuation is less than half normal 26% mark-up and is supported by strong order backlogs, lower than normal inventory, and a good mix of current models.
(c) $5.5MM core of slow moving SKU's estimated @ 66% of book value, with balance valued at 100% of book.
(d) Primarily finished goods in Europe discounted due to smaller dealer network.

(5) ITT refund only significant recovery.

(6) Property and equipment orderly liquidation value:

|  | 6/30/92 Book | 6/30/92 Liquidation | 9/30/92 Book | 9/30/92 Liquidation |
|---|---|---|---|---|
| Net property & equipment @ 50% | $ 1,141 | $ 571 | $ 1,054 | $ 527 |

(7) Other assets orderly liquidation value:

|  | Book | Liquidation | |
|---|---|---|---|
| China Bicycle Company | | $ 8,324 | (a) |
| Hungary/CSEPEL | | $ 319 | (b) |
| CSV Life Insurance | | $ 297 | |
| Tulsa Land | | $ 204 | (b) |
| Paramount | | $ 161 | (b) |
| CCI/CCJ | | $ 62 | (b) |
| Trademarks & Tradenames | | $ 0 | (c) |
| Total Other Assets | $ 6,792 | $ 9,367 | |

(a) CBC claim of $18.2MM multiplied by 32% representing value of forgiveness of CBC's accounts payable claim of $18.2 million plus $2.5 million in cash.
(b) Actual values realized in an orderly liquidation.

(c) The relatively high liquidation values attributed to Schwinn's hard assets (inventory and accounts receivable) assumes that the tradenames are not sold separately. If some value was realized for the tradenames by selling them independently, hard asset liquidation values would need to be reduced significantly due to the impact on the dealer network and brand name.

(8) Includes all operational and administrative personnel necessary to make final shipments, close offices and warehouses, and prepare and collect receivables.

(9) Based upon combined expenses of company, secured, and unsecured counsel; consultants to the company and its creditors; and accountants and actuarials necessary to close the company's books.